INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW–AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Preston Products Company, Inc., Intervenor.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

PRESTON PRODUCTS COMPANY, Inc., Respondent.

PRESTON PRODUCTS COMPANY, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW–AFL–CIO, Intervenor.

Nos. 20137, 20185, 20301.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 28, 1967.

Decided Nov. 14, 1967.

Petition for Rehearing En Banc Denied Jan. 30, 1968.

Certiorari Denied June 10, 1968.

See 88 S.Ct. 2058.

See, also, 126 U.S.App.D.C. 11, 373 F.2d 671.

Mr. John Silard, Washington, D. C., with whom Messrs. Joseph L. Rauh, Jr., Stephen I. Schlossberg, Washington, D. C., and Bernard F. Ashe, Detroit, Mich., were on the brief, for petitioner in No. 20,137.

Mr. Eugene B. Granof, Attorney, National Labor Relations Board, of the bar of the Supreme Court of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Elliott Moore, Attorney, National Labor Relations Board, were on the brief, for petitioner in No. 20,185 and respondent in Nos. 20,137 and 20,301.

Mr. James L. Stokes, Grand Rapids, Mich., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of court, with whom Mr. Stephen C. Bransdorfer, Grand Rapids, Mich., was on the brief, for petitioner in No. 20,301, respondent in No. 20,185 and intervenor in No. 20,137.

Before WILBUR K. MILLER, Senior Circuit Judge, and DANAHER and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

These consolidated cases relate to an order of the National Labor Relations Board issued on April 22, 1964, against Preston Products Company. The Board found that the company had violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 *et seq.* (1964), and ordered it to cease and desist from infringing upon the rights guaranteed to its employees by Section 7 of the Act and to bargain with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, as the exclusive bargaining representative of the company's employees. The union's request that the Board grant appropriate relief to compensate the workers for the period during which the company had wrongfully refused to bargain was denied. Nos. 20,137 and 20,301 are petitions by the union and the company respectively to review the Board's order, and No. 20,185 is the Board's petition to enforce that order.

I

Preston Products Company, located in Grand Rapids, Michigan, is owned and managed by the Preston brothers, Anthony and Albert. In early March 1964 the union began organizational activities at the request of several employees at the plant. On March 18, the Preston brothers, who had been told that "there was a union movement on," convened

meetings of the workers during paid overtime. They invited complaints from the employees, asking "just who it was that wanted the union in there" and "just what was it that * * * a union could do" that could not be done directly by the employees. The Prestons stated that the union had caused various companies to go out of business or move their plants, that the employees would not get anything more than they had now and might in fact lose such currently enjoyed benefits as bonuses, parties and turkeys, and finally that the brothers might simply "get disgusted" and then they "didn't know just what would happen."

Despite these meetings, by March 20 the union had accumulated valid authorization cards from 78 of the 144 employees in the appropriate bargaining unit. The union then requested the Preston brothers to bargain. This request was at first ignored and later denied. Neither would the Prestons agree to submit the cards to a neutral third party for verification. Subsequently, the union filed a petition with the Board, requesting that it be certified as the bargaining representative. At a formal Board hearing on April 7, the company and the union agreed on an appropriate bargaining unit, but since the company stated that it "needed as much time as possible for the campaign," the Board denied the union's request for an immediate election and scheduled the election for May 11, 1964.

Prior to the election, the company conferred various benefits upon the employees. In response to the complaints solicited from the employees at the March 18 meetings, the company reduced by 50 per cent the cost of work gloves which it sold to the employees in the racking department, increased the equipment in the lunch room and ladies room, changed the method of deducting the employees' share of a hospital insurance plan, and promoted one employee who had inquired about advancement. In addition, from March 18 to May 11, 184 separate pay increases were given, so that all employees received at least one pay increase and many received two within a period of less than two months. Moreover, the annual spring party was held two days before the election and at the party each employee was given a gold or silver watch (depending upon the length of service) and Anthony Preston announced (1) the adoption of an improved hospital insurance plan wholly paid for by the company; and (2) the fact that envelopes containing a slip upon which was written the amount of each person's bonus would be distributed the following Monday (election day).

At the same time the company was bestowing benefits, it was also bestowing advice. Circulars were delivered with the pay checks and additional ones were mailed to each employee's home. These circulars contained reminders of the possibility of the Prestons' becoming disgusted and of their putting all existing benefits up for negotiation and starting the bargaining from scratch; they also stated that "[i]f you feel conditions are bad now, they may be worse later." Each circular ended with the warning: "Don't cut your own throat next Monday, Vote No."

The union ultimately received only 45 of the 135 votes cast. Thereafter, it filed with the Board objections to the election and unfair labor practice charges against the company which were later incorporated into the Regional Director's complaint. The Board then scheduled a consolidated hearing before a Trial Examiner. Prior to the hearing, a group of employees formed a committee to keep the union out of the plant and were referred by the company's attorney to Edmund Wolven, a local attorney to represent them. There is no evidence in the record as to the source of Wolven's attorney's fees. Wolven met with various employees, first at an employee's home and subsequently in the plant. The latter conferences were held during working hours and with the permission of the company's personnel manager and president. Wolven interrogated the employees as to their union support and requested that they complete questionnaires which

he had prepared with respect to their signing of the union authorization cards.

At the hearing before the Trial Examiner, Wolven sought to intervene on behalf of the employees who were his clients, but the Trial Examiner limited Wolven's intervention to those employees who had signed the authorization cards and only as to issues raised by their specific cards. Subsequently, it was agreed that the company attorney would call those employees whom Wolven had interviewed but could not now represent. The company's attorney then interviewed these prospective witnesses, again at the plant and with the permission of the management. At no time did either Wolven or the company's attorney advise those employees with whom they spoke that the employees did not have to answer their questions and that there would not be any retaliation if they chose not to cooperate.

The Trial Examiner concluded from all of the evidence in the record that the company had violated Section 8(a) (1) of the Act by threatening employees with loss of employment and other economic retaliations, by promising and granting employees benefits in order to discourage their interest in the union, by furnishing aid and assistance to a group of anti-union employees, and by coercively interrogating employees about their union affiliation. The Trial Examiner also concluded that the company had violated Section 8(a) (5) and (1) of the Act by refusing to recognize and bargain with the union and by making unilateral changes in wages and working conditions. He recommended that the company be ordered to cease and desist from its unfair labor practices and, affirmatively, to bargain with the union upon request. The Board adopted the findings of the Trial Examiner and entered the recommended orders.

## II

■■ These cases do not present any unique questions of law, but rather concern the reasonableness of the Board's findings and the appropriateness of its orders. Section 10(f) of the National Labor Relations Act provides that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall * * * be conclusive." Since the Board is "one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess * * *," this court may not "displace the Board's choice between two fairly conflicting views, even though [it] would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). The Supreme Court has stated the general proposition that "[t]he judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934). And this court has noted the applicability of this principle to cases arising from orders issued by the National Labor Relations Board. International Woodworkers of America v. N. L. R. B., 105 U.S.App.D.C. 37, 39, 263 F.2d 483, 485 (1959). The responsibility for determining the existence of substantial evidence in the record to support the findings and orders of the Board thus rests with the Court of Appeals, but the findings of the Board and the Trial Examiner, especially when, as in the instant case, they concur, are not lightly to be disregarded. Edward Fields, Inc. v. N. L. R. B., 2 Cir., 325 F.2d 754, 759 (1963). Adhering, as we must, to these standards, we turn now to an examination of the principal issues raised in these cases.

## III

■ The Board found that the company violated Section 8(a) (1) of the Act by threats and promises of benefits to its employees. An employer is not pre-

cluded by the Act from stating his own views as to whether or not his employees should join a union; indeed, Section 8(c) of the Act specifically provides that "[t]he expressing of any views, argument, or opinion * * * shall not constitute or be evidence of an unfair labor practice * * *." However, Section 8(c) also includes the qualification that "such expression contains no threat of reprisal or force or promise of benefit." Thus "[e]mployers still may not, under the guise of merely exercising their right of free speech, pursue a course of conduct designed to restrain and coerce their employees in the exercise of rights guaranteed them by the Act." N. L. R. B. v. Gate City Cotton Mills, 5 Cir., 167 F.2d 647, 649 (1948). An employer's prediction of disastrous economic events may constitute an illegal threat if he has it in his power to make the prediction come true. International Union of Elec., Radio, etc. v. N. L. R. B., 110 U.S.App. D.C. 91, 97, 289 F.2d 757, 763 (1960). In this case, the plain meaning of the words used by the Preston brothers in their speeches to the assembled employees and in the circulars distributed to each of them, particularly in conjunction with their bluntly expressed hostility to the union, was that if the employees exercised their right to self-organization, the company could and would retaliate by eliminating bonuses, picnics and other existing benefits, imposing "dictatorial working conditions," or closing the plant. Such statements are well beyond the proper expression of views permitted under Section 8(c) and constitute sufficient evidence of a Section 8(a) (1) violation.

 As to the promise and granting of benefits to employees, the law is well settled that, while a representation election is pending, the conferral of employee benefits for the purpose of inducing employees to vote against a union is unlawful. N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 409–410, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); Joy Silk Mills v. N. L. R. B., 87 U.S.App. D.C. 360, 367, 185 F.2d 732, 739 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734,

95 L.Ed. 1350 (1951). In the instant case, the evidence is unrefuted that 184 separate pay increases were given during a period of less than two months, that improvements in working conditions were effected, that an improved hospital insurance plan was adopted immediately before the election despite the fact that the company had refused to consider such a plan proffered by its insurance agent as late as February 1964, and that a gala party with presents and bonuses for all was held for the employees only two days before the election. Indeed, the company does not seriously contest these findings. Rather, it attempts to minimize their significance by elaborately describing the company as a "closely knit" organization where employer and employees are and have been "intimate" and "long-time neighborhood friends or school chums." However, resolving conflicting interpretations of particular facts is not within the province of this court, for the inferences to be drawn from the evidence are matters for the Trial Examiner and the Board. N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); Joy Silk Mills v. N. L. R. B., supra, 87 U.S.App.D.C. at 369, 185 F.2d at 741. We are satisfied that there is sufficient evidence in the record considered as a whole to support the Board's findings that the flow of these new benefits prior to the election was primarily for the purpose of inducing the employees to vote against the union and was therefore unlawful. Accordingly, a remedial order is appropriate. Cf. United Steelworkers of America v. N. L. R. B., 128 U.S.App.D.C. 219, 386 F.2d 981, 983 (1967).

IV

 The Board also found that the company had violated Section 8(a) (5) and (1) by refusing to recognize and bargain with the union when the union held valid authorization cards from over 50 per cent of the employees in an appropriate bargaining unit. The company correctly points to recent decisions by this court wherein we have held that the

finding of a violation of an employer's statutory duty to bargain entails two prerequisite findings: first, that a majority of the employees freely and fairly reflected an intention to designate the union as their bargaining agent; and second, that the employer did not entertain a good faith doubt as to the authenticity of the cards. Amalgamated Clothing Workers of America v. N. L. R. B. [Sagamore Shirt], 124 U.S.App.D.C. 365, 373, 365 F.2d 898, 906 (1966).

The thrust of the company's attack is directed at the first point. It concedes that the cards are clear and unambiguous on their face and with this concession we are in complete agreement. The company argues, however, that 14 of the 78 cards should be discounted since the employees were misled by statements from union solicitors into thinking that signing a card meant only that they were voting for an NLRB election. Moreover, counsel for the company argues that even if the employees thought that *a* purpose of the cards (as contrasted with the *only* purpose) was for an NLRB election, this is a sufficient basis for discounting those cards. For this latter assertion, counsel relies very heavily on the recent Second Circuit opinion by Judge Friendly in N. L. R. B. v. S. E. Nichols Co., 380 F.2d 438 (1967), wherein the court discounted three cards after its examination of the evidence convinced it that the employees had been misled although the union solicitor had not stated that the only purpose of the cards was to obtain an election.

 This court has consistently upheld the rule, announced by the Board in N. L. R. B. v. Cumberland Shoe Corp., 144 N.L.R.B. 1268 (1963), *enforced*, 6 Cir., 351 F.2d 917 (1965), that where the cards are unambiguous on their face, unless employees were told that an elec-

tion was the *only* purpose of the cards, the employees would be held to the terms of the cards which they had signed. *Sagamore Shirt, supra*, 124 U.S.App.D.C. at 373–374, 365 F.2d at 906–907; Amalgamated Clothing Workers of America v. N. L. R. B. [Hamburg Shirt], 125 U.S. App.D.C. 275, 280, 371 F.2d 740, 745 (1966). Once again, we approve the Board's use of that rule. It is entirely possible, of course, that in a particular case the credited evidence as to the circumstances under which the cards were signed would reveal such gross misstatement as to the union's intention with respect to an election,[1] or as to matters unrelated to an election, that the *Cumberland* rule would not be applied by the Board. Nor would we require its application, for given such gross misrepresentation the employee's signature on the card could not be construed as a fair and free designation of the union as his bargaining agent. Thus *Cumberland* does not articulate an absolute rule, but rather a useful and well founded rule of thumb.

 Moreover, we think the Board was justified here in relying upon that rule in accepting the employees' signatures on the unambiguous cards despite the inconclusive testimony of a few as to the events surrounding the union's solicitation of the cards. Neither the Trial Examiner nor the Board found any credited evidence of gross misrepresentation, nor does the record reveal such evidence to us. Rather, we have here the classic case of employees testifying under the eye of the company officials about events which occurred almost a year before and prior to the activities which were subsequently found to constitute unfair labor practices. It is certainly conceivable that those same threats and benefits which shook an employee's original support for

1. In both *Nichols, supra*, and N.L.R.B. v. Swan Super Cleaners, Inc., 6 Cir., 384 F.2d 609, No. 16,952 (1967), the unions did not petition the Board for an election, but rather sought to have the Board issue an order to bargain solely on the basis of the authorization cards, supported indirectly by the companies' subsequent

unfair labor practices. In the instant case, however, the union requested the Board to hold an election and therefore union statements that one of the purposes of the cards was for an election were accurate representations of the union's intentions.

the union also altered that employee's memory as to events which occurred before the presentation of such threats and benefits.[2] By the time of the hearing the employees may well have changed their minds with respect to union affiliation, but the crucial question in a refusal to bargain case is whether the union had the support of a majority of the employees in an appropriate bargaining unit at the time the request to bargain was made, and not whether that support remains intact some ten months later. The Trial Examiner and the Board answered that question and there is sufficient evidence in the record to support their findings.

This last reference to the function of the Trial Examiner and the Board is closely related to yet an additional reason for supporting the Board's *Cumberland* rule. The *Nichols* rule would require us to examine all relevant testimony in detail, to adjudge the credibility of each witness, and to weigh the evidence. Yet, as noted above, the Board is "one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge," Universal Camera Corp. v. N. L. R. B., *supra*, 340 U.S. at 488, 71 S.Ct. at 465, and it would be difficult to imagine a topic more clearly within this specialized field than the evaluation of the significance of the circumstances under which authorization cards are solicited. Accordingly, we affirm the Board's finding that the union did represent a majority of the employees at the time when it requested the Preston brothers to bargain.

■ This leaves only the question of whether the Preston brothers entertained a good faith doubt as to the authenticity of the authorization cards when the union tendered its request to bargain. The

record is quite clear the answer is no: the Prestons refused to submit the cards to a neutral third party for verification; Anthony Preston testified that at that time he did not even think about whether the union had a majority or not; the Prestons requested the Board to deny the union's request for an immediate election since they "needed as much time as possible for the campaign"; and, finally, the Prestons committed unfair labor practices prior to the election in an attempt to dissipate the union's majority.

The Board, having found that the union had a valid majority, that the Prestons did not have a good faith doubt in refusing to bargain with the union, and that the Prestons committed unfair labor practices to erode the union's majority, was justified in finding a violation of Section 8(a) (5), setting aside the election because of employer misconduct, and issuing an order which included a provision requiring the company to bargain with the union. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); Joy Silk Mills v. N. L. R B., *supra*, 87 U.S.App.D.C. at 372, 185 F.2d at 744.

### V

■ The Board also found that several activities of the company subsequent to the election also violated Section 8(a) (1), specifically, the providing of assistance to an anti-union group of employees and the coercive interrogation of employees through its attorney. The company does not contest the Trial Examiner's finding that the company directed the anti-union employees committee to a local attorney to represent them[3]; authorized the use by the committee of its premises, facilities and personnel; and permitted workers to be interviewed during paid working time. These findings

---

2. Indeed, 10 of the 13 employees relied upon by the company had received not one but two pay increases during the "campaign" period. Surely the Board might well conclude that in the real world employer blandishments and coercion amounting to unfair labor prac-

tices during an election campaign can result in tailored testimony.

3. The record is unclear as to how the employees committee came to be organized and who suggested that the committee obtain counsel.

are supported by sufficient evidence in the record and are clearly a proper basis for the Board's conclusion that the company aided and encouraged employees who were seeking to repudiate the union in violation of Section 8(a) (1). *See* N. L. R. B. v. Scherer & Sons, Inc., 5 Cir., 370 F.2d 12, 13 (1966), *cert. denied,* 389 U.S. 836, 88 S.Ct. 46, 19 L.Ed.2d 97 (1967) ; Edward Fields, Inc. v. N. L. R. B., *supra,* 325 F.2d at 759–760; N. L. R. B. v. Elias Brothers Big Boy, Inc., 6 Cir., 325 F.2d 360, 363 (1963).

▬ The company contends that the interrogation of employees by its attorney did not violate Section 8(a) (1) because such interrogations "were absolutely *essential* to the preparation of Employer's case." This court has noted that, because of the conflicting interests involved, a delicate balance must be achieved between the employer's need to prepare adequately for pending unfair labor practice cases and the inherently coercive nature (in violation of an employee's Section 7 rights) of employer interrogation of employees during a labor dispute. Joy Silk Mills v. N. L. R. B., *supra,* 87 U.S.App.D.C. at 371–372, 185 F.2d at 743–744. In an attempt to strike such a balance, the Board has "established specific safeguards designed to minimize the coercive impact of such employer interrogation. Thus, the employer must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis; the questioning must occur in a context free from employer hostility to union organization and must not be itself coercive in nature * * *." Johnnie's Poultry Co., 146 N.L.R.B. 770, 775 (1964). *Cf.* International Union of Operating Eng., Local 49 v. N. L. R. B., 122 U.S.App.D.C. 314, 316–318, 353 F.2d 852, 854–856 (1966).

▬ There is sufficient evidence in the record to support the finding of the Trial Examiner and the Board that in this case some of these safeguards were conspicuously absent: the interrogation occurred in the plant's conference room; only a most general explanation was given of why the information requested was being sought; and the attorney did not specifically state that the employees could choose not to cooperate and in the event they so chose no reprisals would be taken. The company argues that such safeguards were not necessary here where the employees had already spoken with the attorney representing their fellow employees. This argument does not, however, meet the objection to such interrogations, for when an employee is told that his testimony would be helpful to both the employer and the anti-union employees committee, he might reasonably suspect that any indication that he signed the card because of a desire for union representation would result in retaliations from either or both the company and his anti-union fellow workers. Accordingly, we affirm the Board's finding that the company violated Section 8(a) (1) by coercively interrogating employees with respect to union activities.

## VI

Counsel for the company alleges that it was precluded from giving an orderly, effective presentation of its case by three rulings made by the Trial Examiner at the unfair labor practice hearing. We find this allegation to be without merit. The specific rulings in question are: (1) limiting Wolven's intervention to only those employees who had signed authorization cards and only as to issues raised by those specific cards; (2) requiring every employees to state the name of the union solicitor who had solicited his card before permitting him to testify with reference to the comments made by that solicitor; and (3) declining to rule immediately on the General Counsel's motion to strike the testimony of each witness whose pre-hearing statement had not been produced by the company.

▬ The first claim is easily disposed of since Section 10(b) specifically provides, *inter alia,* that intervention is a matter of discretion for the Trial Examiner or the Board, and we find no

abuse. *See also* Semi-Steel Casting Co. v. N. L. R. B., 8 Cir., 160 F.2d 388, 393, *cert. denied,* 332 U.S. 758, 68 S.Ct. 57, 92 L.Ed. 344 (1947). The second and third claims also relate to the exercise of Board discretion and again we find no abuse. Moreover, no prejudice is shown, since eventually all of the employees whose testimony was desired by the company were able to identify the persons who had solicited their cards and the Trial Examiner ultimately denied the General Counsel's motion to strike.

## VII

We come lastly to the principal issue raised in the union's petition to review the Board's order. The union asserts that, although the Board sustained its charges as to the company's violation of Sections 8(a) (1) and 8(a) (5), it summarily dismissed the union's request for compensatory relief for the employees for the period during which the company wrongfully refused to bargain. The union argues that it is incumbent upon the Board to elaborate the grounds for a grant or denial of discretionary relief, Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), and that therefore a *remand* is required as a matter of law. We find it unnecessary to reach this issue, since subsequent to its rejection of the union's request the Board reconsidered the question of the appropriateness of compensatory relief and has itself petitioned this court to remand that part of the April 22 order which pertains to compensatory relief. It is the intention of the Board to evaluate this suggested relief in the light of variant fact patterns, of which this case is only one, and in that way contribute to the orderly development of the law.

Accordingly, the Board's petition for enforcement of its order is granted, except for that portion which dismisses the union's request for compensatory relief, and the company's petition for review is denied.

So ordered.

Senior Circuit Judge WILBUR K. MILLER dissents and calls attention to the case of NLRB v. Swan Super Cleaners, Inc., 384 F.2d 609, decided by the Sixth Circuit October 25, 1967, No. 16952. In that case the court discussed its ruling in NLRB v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965), and concluded, in a factual situation much like that involved here, that authorization cards obtained by misrepresentation as to their purpose must be invalidated, even though the unambiguous language of the cards amounts to a choice of the union as bargaining representative.