**SOUTHWEST REGIONAL JOINT BOARD, AMALGAMATED CLOTHING WORKERS OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**LEVI STRAUSS & CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 22081, 22259.**

United States Court of Appeals, District of Columbia. Circuit.

Argued Sept. 11, 1970.

Decided Dec. 15, 1970.

---

Wilkey, Circuit Judge, concurred in part and dissented in part, and filed opinion.

Mr. Neil D. Lipton, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Jacob Sheinkman, New York City, was on the brief, for petitioner in No. 22,081.

Mr. Franklin R. Sears, Fort Worth, Tex. with whom Mr. Joseph P. Parker, Fort Worth, Tex., was on the brief, for petitioner in No. 22,259.

Mr. Thomas E. Silfen, Attorney, National Labor Relations Board, of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Warren M. Davison, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before FAHY, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

FAHY, Senior Circuit Judge:

In No. 22,259, Levi Strauss & Co. v. NLRB, the Company petitions for review of an order of the National Labor Relations Board, based on findings that the Company violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act. The order requires the Company to (1) cease and desist from its course of unlawful conduct, (2) reinstate with back pay an employee found to have been discriminatorily discharged, and (3) bargain collectively with the Union, with appropriate posting of notices.

In No. 22,081, the Board denied the request of the Union [1] for an additional monetary order to compensate the employees for losses due to the Company's refusal to bargain.

*No. 22,259.* On September 21, 1966, the Union, with authorization cards which it claimed had been signed by a majority of employees in an appropriate

---

1. The Union is Southwest Regional Joint Board, Amalgamated Clothing Workers of America, AFL-CIO.

The cases have been consolidated for review in this court.

bargaining unit, requested recognition as the exclusive bargaining agent of the employees, and offered to prove its majority status by an impartial third-party check. The Company not having responded, the Union on September 29 petitioned the Board for an election. On October 7 the Company expressed the view that the Union "did not appear to represent an uncoerced majority of employees in an appropriate unit" and declined recognition.

At an election held on January 6, 1967 the Union lost. But as the result of a hearing on the Union's objection to the validity of the election and a complaint of unfair labor practices, the Board set aside the election and entered the order to which we have referred. We enforce the order of the Board.

The Board found that subsequently to the Union's demand for recognition the Company committed unfair labor practices by:

(1) announcing additional overtime benefits to induce employees to vote against the Union; (2) maintaining in effect, with the intent to enforce, an illegal no-solicitation rule; * * * (3) [the] plant manager['s] veiled threats to all production and maintenance employees that the selection of the Union would result in loss of benefits relating to production quotas and leaves of absence. * * * [4] discriminatorily discharging union chairlady Casey, and * * * [5] * * * coercive interrogation of employee Beasley [and] employee Nick * * *.

We consider these findings seriatim.

1. The Tyler, Texas, plant here involved was the only one of four non-union plants of the Company where employees were not paid overtime wages for work in excess of eight hours on a daily basis. On October 1, two days after the Union's petition for an election, the Company notified the employees that retroactive to August 22, 1966 overtime would be paid for such work based on daily computations. In the circumstances in which it occurred, the Board's finding that this unilateral action was to induce employees to vote against the Union is consistent with the precedents and is sustained. *See* International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW–AFL–CIO v. NLRB, 129 U.S. App.D.C. 196, 201, 392 F.2d 801, 806 (1967), and cases cited, including NLRB v. Exchange Parts Co., 375 U.S. 405, 409–410, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).

The Company contends that it had made the decision to grant the overtime wage increase the previous May but that it was not to be announced until August 22. The Company points to letters of August 19 and August 22 to the four non-union plants, which includes Tyler, announcing other changes for the benefit of employees to be effective August 22, and says that the intended overtime change at Tyler was inadvertently omitted in the letter to that plant.

■ Both Trial Examiner and Board reviewed in detail the factual situation which led each to conclude that the omission was not inadvertent. Four of the Company's national officers were acquainted with the contents of the Tyler letter, yet none sought to correct it or the situation at Tyler. Moreover, that this important decision had been made in May, with the Tyler plant manager being unaware of it until October and unable to correct the situation, seemed to the Board not to be credible. The record as a whole supports the Board and we sustain its finding of a violation of Section 8(a) (1) of the Act.

2. Throughout the Union's organizational campaign and up to the election the Company gave to each employee a handbook of "House Rules", which contained a no-solicitation rule strictly prohibiting without management approval solicitation of employees on Company property by anyone for any purpose. The Board found that maintenance of this rule, operative even during non-working time, constituted a violation of

Section 8(a)(1). We sustain the Board. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803–805, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *see* United Steelworkers of America, AFL–CIO v. NLRB, 129 U.S.App.D.C. 260, 262, 393 F.2d 661, 663 (1968).

■ The illegality of the rule itself is not seriously disputed by the Company. It contends, however, that since the rule was not enforced and was rescinded on February 24, 1967, there was only a technical violation of the Act and a remedial order should not issue. But the rescission was after the election,[2] and it cannot be assumed that the existence of the no-solicitation rule did not deter some employees from exercising their Section 7 rights. In alluding to the inferences and conclusions that the Board may draw from proven facts, in our case the existence of an illegal no-solicitation rule, the Supreme Court in Republic Aviation Corp. v. NLRB, *supra*, at 800, 65 S.Ct. at 986, said:

> An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven.

And as this court has said, the proper question "is not whether an employee actually felt intimidated but whether the employer engaged in conduct which may reasonably be said to tend to interfere with the free exercise of employee rights under the Act." Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 371–372, 185 F.2d 732, 743–744 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). We accordingly think it fairly can be held that the Board acted within its competence in holding that the existence of the illegal no-solicitation rule constituted an unfair labor practice in violation of Section 8(a)(1).

3. On the two days preceding the election the plant manager at different times addressed all Company employees in the appropriate bargaining unit. There was testimony, credited by the Trial Examiner and the Board, that he stated: that "if the union came in the union would give [the employees] a certain length of time to make production * * * [and] if the employees didn't make production that quick that the company would have to get rid of those" employees; that "if we [employees] made over our quota the union would fine us and if we didn't make our quota in a certain length of time * * * they would have to let us go," notwithstanding some of the girls had been employed a year and still had not made production; and that employees would have to go through the Union to obtain a leave of absence, and if the Union representative were absent, the employees would be obliged to wait until he returned. These statements were made in the course of a rather wide-ranging discussion of likely disadvantages to the employees if the plant went union.

■ The Board, following the Trial Examiner, found that the statements to the employees that if selected as bargaining agent the Union would cause the loss of existing benefits relating to production quotas and would make it more difficult to obtain leaves of absence were coercive of employees in violation of Section 8(a)(1) of the Act. The Board characterized these portions of the speeches as "veiled threats to all production and maintenance employees that the selection of the Union would result in loss of benefits relating to production quotas and leaves of absence." We think this finding must be sustained as not incon-

2. The rule was maintained within the six month period prior to filing of the charge. Therefore, the six months limitations period prescribed by Section 10(b) of the Act did not bar its consideration by the Board, notwithstanding the rule was promulgated more than six months prior to the filing of the charge.

sistent with Section 8(c) of the Act.[3] In NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), Section 8(c) was analyzed in light of both the First Amendment and Section 8(a) (1) of the Act. The Court held:

> [A]n employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a) (1) and the proviso to § 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear. ·

395 U.S. at 617, 89 S.Ct. at 1942. Though the employer "may * * * make a prediction as to the precise effects he believes unionization will have on his company," the prediction, the Court held, insofar as presently pertinent, "must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control * * *." Id. at 618, 89 S.Ct. at 1942. Tested by this analysis we would not be justified in overriding the Board's interpretation of the speeches as threats of loss of benefits rather than as predictions based on objective fact. The representations were not factually supported. Indeed, the Company made no effort to support their accuracy.[4]

4. Miss Lula Casey was active among the employees on behalf of the Union.

At its first meeting on April 4, 1966 she was elected Union Chairlady. These facts were known to the plant manager. On her way to work on Thursday, December 15, 1966, Miss Casey suffered a back injury in an automobile accident and remained away from the plant for over a month, part of the time in a hospital. She telephoned her supervisor on the Tuesday following the accident that she was in the hospital under orders of her doctor.[5] After Miss Casey returned home she telephoned her supervisor again to advise her that she did not know when the doctor would release her so that she could return to work. Her supervisor told her to do what the doctor said and added that she would look forward to her return. Miss Casey returned on January 6, however, before her release from the doctor, to vote in the election. While she was standing in line to vote the Company election observer challenged her on the ground she had not called in when away and had not obtained a leave of absence. Later that day she was advised by the plant manager that she had been fired for these reasons.

■ The finding of the Board, following that of the Trial Examiner, that her discharge was in violation of Section 8(a) (3), is quite adequately supported by the record, so as to preclude our setting it aside. Plainly the Company was antagonistic to the attempt of the Union to organize its employees, and to the distress of the plant manager Lula Casey was a principal organizer. Neither of the two reasons given by the Company for her discharge supported it. She did call her supervisor to report her absence,

---

3. Section 8(c) provides:
 The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

4. We have considered the Company's procedural contention regarding the decision

of the Board which rests upon the speeches, namely, that the allegations of the complaint relied upon alleged a threat to "impose more stringent working conditions" rather than, as found, "a threat of loss of existing benefits." We find this contention, as well as other procedural objections in connection with this aspect of the case, to be untenable.

5. Miss Casey's supervisor visited her in the hospital.

and the rule invoked against her regarding a leave of absence, as later conceded by the Company, did not apply to her. Furthermore, although the Company discovered both mistakes immediately after she was told on January 6 she was discharged, when the plant manager on January 11 first advised her that she would be rehired he said it would be only as a beginner, though her status was later restored.

█ 5. At the hearing held on May 9, 1967 to determine the validity of the election, employee Ruth Nick testified; upon returning to the plant after her testimony, she was engaged in conversation by her supervisor. She was later recalled to testify about this conversation. The conversation dealt with what had transpired shortly before at the hearing, which we assume was public, and seems to us to have been no more than a display of the supervisor's curiosity as to what had occurred. Thus construed we do not sustain the finding that it was coercive and a violation of Section 8(a) (1), especially coming as it did after the election.[6]

The conversation of the assistant plant manager with employee Beasley on the very day of the election,[7] however, though it might not have been intended as coercive, we think justified the Board in finding that it was. The inquiry about Mrs. Beasley's own vote, made by the assistant plant manager himself, gives support to the position of the Board that the employee could well have considered the conversation as pressure upon her not to vote or not to vote for the Union.

6. We come to the finding that the Company refused to bargain, in violation of Section 8(a) (5) of the Act. When on October 7, 1966 the Company responded negatively to the Union's request for recognition, the Union held 101 cards signed by employees authorizing the Union to represent them.[8] The number of employees in the unit, the appropriateness of which is not now questioned, was 168. The Trial Examiner upheld the validity of 87 of the cards, without passing upon the remaining 14, thus finding a clear majority in the 168 employee unit. The Board found, how-

6. We have also considered but do not accept the Company's contention that it was deprived of a fair opportunity to prepare its defense because a continuance was not granted when the complaint was amended to encompass the interrogation of Ruth Nick. The Trial Examiner did postpone the hearing from Friday to the following Monday, and we agree that since the new allegations involved only a single incident of interrogation, any necessary research could have been accomplished over the weekend.

7. On direct examination Mrs. Beasley gave the details of the conversation referred to. These included the assistant plant manager's inquiry about her voting and his reference to the efforts of the Union at another plant to get in. He said they were invited in and "it didn't work there and he didn't think it would work at this plant." On cross examination she was asked to repeat his exact words and said:
 And he asked me if I thought the union would get in and I told him I didn't know. And then he asked me if I was going to vote and I told him I didn't—I hadn't decided because if I voted for them some would be mad at

me, and if I voted against them, some would be mad at me, and I would prefer just staying in the middle of the road.
 I took it as a joke, because—well, I mean, I am the maid and I am connected with all of them and I was making a joke out of it.
 Our dissenting colleague states that Mrs. Beasley took the conversation with the assistant plant manager "as a joke." We think not, but rather she was describing the attitude she desired to assume toward her fellow employees who might differ with her.

8. The cards read as follows:
 Application for Membership in the
 Amalgamated Clothing Workers of America,
 AFL-CIO 2914 Rosedale JE.-53821 Fort Worth, Texas.
 I, the undersigned, hereby apply for membership in the Amalgamated Clothing Workers of America, and do hereby appoint and authorize the officers thereof, to represent and negotiate for me in all matters pertaining to wages, hours and other conditions of employment.

ever, that among the 87 cards, four were not signed by employees of the Company when recognition was refused. The Board accordingly proceeded to consider the additional 14 cards which the Trial Examiner had not examined. The Board held that by these cards seven employees had validly designated the Union as their bargaining agent, thus reasserting the Union's majority status among the 168 employees.

In challenging this result the Company urges principally that passages in a booklet used by the Union in its organizing campaign offset the language of the cards by indicating to employees that in signing a card they were going no further than approving the holding of an election and were not presently designating the Union as their bargaining representative. The authorization cards, however, clearly authorized the officers of the Union to "represent and negotiate" for the signatory in all matters pertaining to conditions of employment, as well as constituting an application "for membership" in the Union. *See* note 8 *supra*. As the Supreme Court has said in *Gissel Packing, supra*, "employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." 395 U.S. at 606, 89 S.Ct. at 1936. While the Supreme Court agreed with the Board's

own warning in our present case that "trial examiners should not neglect their obligation to ensure employee free choice by a too easy mechanical application of the *Cumberland* rule," [9] *id.* at 607–608, 89 S.Ct. at 1937, the Court gave no indication that it doubted the results reached by the Board in the present case.

■ After *Gissel Packing* was decided by the Court, the Board reconsidered the Section 8(a) (5) phase of its present decision and again concluded that the Union had validly obtained a majority of authorization cards and was the duly authorized representative of the employees. Upon the basis of our own careful review of the record we do not disturb this conclusion. In its references to an election, the booklet did not nullify the clear language of the cards themselves.[10] We have considered also statements made by Union agents during the organizing campaign, though these are not relied upon by the Company in this court, and we have taken into account the cards of the seven employees upheld by the Board which were not originally included among the 87 found by the Trial Examiner to have validly designated the Union.

■ 7. We now consider the appropriateness of the remedy ordered by the Board. Assuming the correctness of the findings of violations of Sections 8(a) (1) and (a) (3), the only question

9. The *Cumberland* rule is set forth by the Court in *Gissel Packing* as follows:
 [I]f the card itself is unambiguous (*i. e.*, states on its face that the signer authorizes the Union to represent the employee for collective bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told that the card was to be used *solely* for the purpose of obtaining an election.
 395 U.S. at 584, 89 S.Ct. at 1925. *See also* Cumberland Shoe Corp., 144 N.L. R.B. 1268 (1963).

10. The booklet contained statements that "[w]hen the majority of the workers in a factory have signed Union Membership cards, the Union then notifies the Na-

tional Labor Relations Board * * * that it desires the board to hold an election," that "[w]hen the Labor Board is sure that the Union has the support among the workers, they call for a Secret Ballot election, where every worker is given a chance to vote * * * whether he is for or against the Union," and that "[w]hen the Labor Board announces after the election that a majority of the workers have voted for the Union, they will then order the Company to bargain with the Union." The booklet also contained a picture of a person casting his ballot in a Labor Board election. At the end of the booklet, however, it was stated: "To get a Union in your plant, it is necessary that a majority of workers sign Union Application cards—Do your part."

about the terms of the order raised by the Company is with respect to the violation of Section 8(a) (5). As to this, it follows from the violations of Sections 8(a) (1) and (a) (3) that setting aside the election was within the authority of the Board and was properly exercised. As to the provision of the order requiring the Company to bargain with the Union long after the original refusal to do so, it too was within the authority of the Board and was properly exercised, notwithstanding the Union lost the election. In this connection we accept the Board's conclusion that the 8(a) (1) and (a) (3) violations were serious and substantial and sufficient to establish that the Company had as its purpose either the rejection of the collective bargaining principle or the desire to gain time within which to undermine the Union and dissipate its majority. In such a situation, notwithstanding the loss of majority status,

> the Board is not limited to a cease-and-desist order * * * but has the authority to issue a bargaining order without first requiring the union to show that it has been able to maintain its majority status. *See* NLRB v. Katz, 369 U.S. 736, 748, n. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942). And we have held that the Board has the same authority even where it is clear that the union, which once had possession of cards from a majority of the employees, represents only a minority when the bargaining order is entered. Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944).

NLRB v. Gissel Packing Co., *supra*, 395 U.S. at 610, 89 S.Ct. at 1938.

*No. 22,081.* The Union requested the Board to award monetary compensation to the employees to make them whole for losses suffered as a result of the Company's refusal to bargain. The Board, however, deemed it inappropriate in this case to depart from its existing policy with respect to remedial orders in cases involving violations of Section 8(a) (5), and therefore denied the request, citing Monroe Auto Equipment Company, Hartwell Division, 164 N.L.R.B. No. 144 (1967).

In International Union of Electrical, Radio & Machine Workers, AFL–CIO v. NLRB [Tiidee Products], 138 U.S.App. D.C. 249, 426 F.2d 1243, cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970), this court held that to grant such monetary relief was within the Board's power under Section 10(c) of the Act, which authorizes the Board to require the employer "to take such affirmative action * * * as will effectuate the policies" of the Act. The court stated in *Tiidee* that the Section 8(a) (5) unfair labor practice of the Company in refusing to bargain after the election was a "clear and flagrant violation of the law," and that its objections to the election were "patently frivolous" and violated the express terms of an agreement entered into between the parties that disputes would be settled by the regional director of the Board. We held that at least in such circumstances it was not sufficient for the Board simply to point to its conventional cease and desist order and its order to bargain as the means of effectuating the policies of the Act. The case was remanded to the Board "with a directive to make supplementary findings in the event the Board determines on remand that it should not grant any make-whole relief, in whole or in part." 138 U.S.App.D.C. at 259, 426 F.2d at 1253.

In our subsequent decision in United Steelworkers of America, AFL–CIO v. NLRB, 139 U.S.App.D.C. 146, 430 F.2d 519 (1970), however, a remand of like character was not deemed to be required. In contrast with the *Tiidee* case, it was held that the legality of the company's refusal to bargain based on authorization cards "rested on a [factually] debatable question." The court could not say "that the employer engaged in this litigation in order to delay the final resolution of the dispute. Instead it desired only to obtain an au-

thoritative determination of the validity of the Board's decision," in contrast with raising, as in *Tiidee*, "patently frivolous" issues.

 In the circumstances of the violation of Section 8(a) (5) in the present case, majority representation by the Union was factually "debatable," and the issues respecting such representation were not frivolous. For these and the additional reasons why no remand was ordered in *United Steelworkers*, we do not order it here. We do not base this decision, however, upon the recent conclusion of a divided Board in Ex-Cell-O Corp., 185 N.L.R.B. No. 20 (1970), disagreeing with our *Tiidee* decision that such relief is within the power of the Board. Placing substantial reliance upon H. K. Porter Co. v. NLRB, 397 U. S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), the Board concluded:

> Much as we appreciate the need for more adequate remedies in 8(a) (5) cases, we believe that, as the law now stands, the proposed remedy is a matter for Congress, not the Board.

*Ex-Cell-O Corp., supra*, at 14. We respectfully disagree, as our opinions in *Tiidee* and *United Steelworkers* disclose. We remain of the view that the provision for "such affirmative action * * * as will effectuate the policies" of the Act empowers the Board in some circumstances to require the employer to make the employees whole for such measurable losses, if any, as result from an unlawful refusal to bargain.

The order of the Board is enforced.[11]

WILKEY, Circuit Judge (concurring in part and dissenting in part):

I concur in No. 22,081, Southwest Regional Joint Board, Amalgamated Clothing Workers v. NLRB, as the Board's action was correct, whether judged by its own policy re remedial orders or by the principles recently enunciated in this Circuit.

However, in No. 22,259, Levi Strauss v. NLRB, although I concur in enforcing the Board's order, I cannot join my colleagues in sustaining the Board's finding that the Company committed two of the five unfair labor practices found: either (1) in announcing on 1 October 1966 that overtime would be based on daily instead of weekly computations, retroactive to 22 August 1966, or (5) when the assistant plant manager questioned Mrs. Beasley regarding her vote on the day of the election.

*I. The Change from Weekly to Daily Overtime*

The majority upholds the Board's finding that the action of the Company in granting the employees of the Tyler plant daily instead of weekly overtime two days before the election was specifically designed to induce the employees against the Union. Since the Board simply adopted the position of the Examiner on this point, it is apparent that the majority finds the conclusion of the Examiner had a rational basis in the record.[1] I cannot agree.

Since the Board's and Examiner's finding can only rest on disbelieving the testimony of the only witness unquestionably in a position to know the truth of the matter, and a man's honor and veracity are not to be taken lightly, it is worthwhile to examine *all* the evidence on this point.

Four form letters, dated August 19, 1966, were sent to the Company's nonunion plants. According to the Examin-

---

11. Our disagreement with the finding of the Board regarding the conversation of the supervisor with employee Nick requires no modification of the order in view of the other violations of Section 8(a) (1).

1. Mississippi Valley Barge Line Company v. United States, 292 U.S. 282, 286–287,

54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934). *See also* International Union, United A., A. & A. Imp. Wkrs. of America UAW-AFL-CIO v. NLRB, 129 U.S.App.D.C. 196, 200, 392 F.2d 801, 805 (1967); International Woodworkers of America, Local Unions 6–7 and 6–122, AFL-CIO v. NLRB, 105 U.S.App.D.C. 37, 39, 263 F.2d 483, 485 (1959).

er's opinion, these were "identical form letters, differentiated only by the typed insertion of the respective plant manager's name and situs of the plant at the top of each letter." The purpose of the letters was to instruct the plant managers of each of the four non-union plants "to place into effect as of August 22, 1966, various increased benefits set forth therein." According to the Examiner, "[t]hese benefits related to operator pay, health insurance, overtime pay (but of a different nature than that under discussion), accident pay, and eligibility reduction for holiday pay and life and helth [sic] insurance."

Selin, the Industrial Relations Manager of the Company, testified that an *additional* paragraph for Tyler only, instructing Tyler to pay daily instead of weekly overtime, was intended to have been inserted in the form letter sent there, but had been inadvertently omitted. It was claimed that this change was to be made in order to have the system of overtime payment at Tyler conform to the method used in all other Company plants. Concededly, the system used at Tyler was unique in the Company.

The Examiner refused to credit this testimony for a variety of reasons. First, he claimed to be amazed that neither Selin nor other national executives who had been party to the decision to change Tyler's method of overtime payment caught the omission. But Selin was "tied up" with other matters in Georgia at the time the letter was sent, although its content was his responsibility. True, copies of the letter were sent to Selin and other executives who knew of the situation at Tyler, but, as Selin testified, he was then concerned with other matters. It is not difficult to conceive that a busy national executive, away from his office, would only lightly skim such correspondence and not closely examine it. Selin's error in not catching the omission was his *mistake*, but that it was a mistake and only that is entirely believable.

Nor is it so surprising that the other executives who knew of the decision to change the system of overtime computation at Tyler failed to catch the omission when they received copies of the letter. The decision to make the change took place in May, *three months before* the letter was sent. It is highly unlikely that executives whose functions were not directly affected by the change would keep that change foremost in their minds for such a long period of time. Undoubtedly, they received a copy of each of the four letters, which were, after all, the same except for the caption at the top. Absent an extremely sharp memory, which the Act does not demand all executives to possess, these people would have found nothing specific to direct their close attention to the letter sent to Tyler.

Perhaps with this probability in mind, the Examiner states, "even more peculiar is the fact that some responsible official * * * *did* examine the August 19 letter closely enough to send a second letter under the date of August 22, 1966, to each of the nonunion plants, this for the specific purpose of making a correction of a different provision concerning overtime pay which was included in the August 19 letter." But nowhere in the record is it indicated that this "some responsible official" knew that the method of overtime payment unique to Tyler was to be changed. Moreover, this statement ignores the fact that these were *form* letters. There is no proof that the letter to the Tyler plant was in fact the one the "official" examined when he found the error. What is more likely under the circumstances is that this "official" examined the master of the form letters sent to the four plants, which, of course, would under no circumstances have included the special paragraph applicable only to Tyler.

On brief the Board cited as additional support for its position the fact that Rutter, the Tyler plant manager to whom the 19 August letter was addressed, never caught the error. Rutter never attended the meeting at which the

decision to change the method of computing overtime at Tyler was made. Nevertheless, to assume, claims the Board, that in the three months intervening between the decision and the date of the letter Rutter never found out about the change is "dubious."

But Rutter was unacquainted with Selin, who had joined the Company at the beginning of May 1966, and the record shows that Selin never visited the Tyler plant until the latter part of September, at which time he claimed to have caught the omission. Since Selin was the national executive primarily responsible for the initiation and implementation of the agreed changes, it is quite impossible to infer from a record otherwise silent on the matter that other executives present at the meeting in May took it on themselves to tell Rutter of the decision.

The Examiner dug out considerable minutiae to support his finding, but he never relied on the ground that Rutter, the Tyler plant manager, knew in advance the benefits which were to be listed in the letter. If this could have been said—which it was *not*—it would have been conclusive that Selin's discovery was an afterthought. The Examiner's opinion says that each letter "instructed the plant manager of each plant to place into effect as of August 22, 1966, various increased benefits set forth therein." Obviously, it was *not* the position of the Examiner that any of the plant managers knew in advance, even informally, exactly what benefits would be listed in the letter. Thus the Examiner's position is the only one consistent with the tenor of the letter as shown in the record—the only concrete evidence bearing on this issue—and that position does not support the Board's contention.[2]

The Examiner viewed "with suspicion" Selin's assertions that he discovered the error in a conversation with the Tyler payroll clerk on 29 or 30 September. He thought it "rather curious that a payroll clerk would be the one to bring the matter up out of a clear blue sky, so to speak." But Selin testified that on his visit to Tyler, the payroll clerk came to see him "and wanted to ask me some questions on computations of pay and that she brought up, in her example, that she was bringing up to me, she brought up this that they were not paying overtime after eight hours in a day."

The "matter" obviously was not brought up out of a clear blue sky. In the context of an example given him by the clerk, Selin realized that Tyler was still computing overtime on a weekly instead of a daily basis. It was then that he became aware of the possibility of an error in the 19 August letter. Nor would it have been unusual for the payroll clerk at that time to have been concerned about the correctness of her overtime computations. The 19 August letter contained a provision changing the method of payment of overtime at all nonunion plants, including Tyler. Understandably, the payroll clerk would have been anxious to check out her interpretation of the effect of the change with the national executive who initiated it. Selin's visit to the Tyler plant came only one month after institution of the increased benefits set out in the 19 August letter.

In footnoting his reasons for viewing Selin's story with suspicion, the Examiner noted that the payroll clerk was never called to corroborate the alleged manner in which the error was discovered. But the testimony on this point,

2. The letter begins:
 Dear Jim:
 We have reviewed your recommendation for increased benefits in the Tyler plant, and in view of the progress made to date, we have approved the following:
 In closing, the letter states:
 We are pleased to extend these benefits to the Tyler employees. Please cover this with your personnel immediately.
 There is nothing within the four corners of the document from which to infer that "Jim" or any other of the plant managers who received the identical letter already knew which benefits were to be thereby approved.

insofar as it appears from the Appendix prepared for the appeal, was never challenged on cross nor contradicted by the Union. While it is certainly preferable to have important testimony corroborated wherever possible by an independent source, it should not be ignored for the sole reason that it is *un*corroborated, particularly where it is also *un*challenged and *un*contradicted.

The Examiner found it to be "illogical" to specifically defer the one benefit applicable solely to Tyler, *i. e.*, the change from weekly to daily overtime. The 19 August letter, however, already contained one provision that would have changed the method of overtime computation at Tyler. To my mind, logic would have compelled the deferral of the specific change from weekly to daily overtime to the date of institution of the latter, as the Company claims was done. In that way, the administrative personnel at Tyler responsible for overtime computation would have only one effective date to which to refer, and would avoid the confusion of changing their method of computation twice in the administratively short space of three months.

It is a valid management prerogative to determine *when* benefits will be instituted; the timing thereof is not unlawful as long as the purpose does not contravene any provision of the Act. Here the decision to change Tyler's method of overtime computation was made in May, as was the decision to defer institution of the change to August. At that time, no one knew that an election would take place at Tyler in October. The purpose of deferring institution of the change could not have been to affect the outcome of the election; consequently, this action could not have been unlawful.

The record simply provides no basis for concluding that there never was a decision made in May to change Tyler's method of computing overtime, that there never was an omission from the form letter sent to Tyler, that there never was a discovery of the omission during Selin's visit to Tyler, and that the notice posted on 1 October never was Selin's good faith effort to correct this error. In other words, there "never was" a basis for concluding that a substantial portion of Selin's testimony was a fabrication. On this issue, I therefore dissent.

II. *Interrogation of Employee Beasley*

The majority sustains the Board in concluding that the election day conversation carried on by the assistant plant manager with Mrs. Beasley was unlawfully coercive, because she "could well have considered the conversation as pressure upon her not to vote or not to vote for the Union." This subjective impression, supplied Mrs. Beasley gratuitously by the majority, is refuted by her own description of her reaction to the assistant plant manager's questions: She testified that she took the conversation "as a joke." Moreover, she further testified that she *did* vote in the election. Clearly, she did not feel herself intimidated by the conversation and in fact *was not* intimidated. Measured by both subjective and objective standards, the testimony of record shows that the conversation could not have been coercive. I cannot join in saying that it was.