**COOK PAINT AND VARNISH COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–2557.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1981.
Decided April 2, 1981.

Edward T. Matheny, Jr., Kansas City, Mo., with whom Linda J. French, Shawnee Mission, Kan., on brief, for petitioner.

Michael Smith, a member of the bar of the Supreme Court of the State of Washington, on motion of Paul J. Spielberg, was allowed to argue pro hac vice for respondent (NLRB), with whom Paul J. Spielberg, Deputy Asst. Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for respondent.

Before WRIGHT, ROBB and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge HARRY T. EDWARDS.

Opinion dissenting in part filed by Circuit Judge ROBB.

Dissenting opinion filed by Circuit Judge J. SKELLY WRIGHT.

HARRY T. EDWARDS, Circuit Judge:

At issue in this case is whether an employer violates Section 8(a)(1) of the National Labor Relations Act ("NLRA" or the "Act")[1] by seeking to compel employees, at an investigatory interview, to respond to questions raised by company counsel relating to a union grievance that has been scheduled for arbitration. The National Labor Relations Board ("NLRB" or the "Board") held in this case that Cook Paint & Varnish Company (the "company") violated Section 8(a)(1) of the Act by threatening two employees with suspension or discharge if they refused to respond to such questions, and ordered the company to cease and desist from this allegedly unlawful conduct. In reaching this conclusion, the Board adopted what appears to be a *per se* rule that an employer may never use a threat of discipline to obtain information from an employee concerning a matter that has been set for arbitration. On petition for review brought by the company, and cross-application for enforcement by the Board, we decline to enforce the order of the Board and remand this case to the Board for further proceedings.

## I. BACKGROUND

The facts are not in dispute and may be stated briefly.[2] On February 3, 1978, an incident occurred at a company facility that contributed to the eventual discharge of employee Paul Thompson.[3] This discharge led to the filing of a contract grievance by the Paintmakers and Allied Trades Local 754 (the "union"), the certified bargaining representative of the company's employees. When the grievance was not resolved successfully under the established grievance provisions of the collective bargaining agreement between the company and union, the union appealed the case to binding arbitration.

After the matter had been scheduled for arbitration, the company called in William Nulton, its outside labor relations attorney. A. 110.[4] The company presented Nulton with a case file on the dispute, which included information concerning two proceedings related to the Thompson discharge that had been decided adversely to the company. In one proceeding, Thompson had been awarded unemployment compensation from the Missouri Employment Security Division, after a hearing in which the company's contention that Thompson had been fired for cause was rejected. ALJ 3.[5] In the second proceeding, the Occupational Safety and Health Administration (OSHA) had issued a citation and fined the company $450 following an administrative investigation of the February 3 incident. A. 77, ALJ 3.

Believing that, as a result of the outcome of these two related proceedings, the arbitration case perhaps should be settled, Nulton decided to interview persons potentially knowledgeable of the February 3 incident. A. 77–80. In particular, Nulton sought to interview Jesse Whitwell and Doug Rittermeyer, two employees who had been interviewed by the Government investigator prior to the issuance of the OSHA citation. A. 76. Both Whitwell and Rittermeyer

---

1. 29 U.S.C. §§ 151–69.

2. A complete statement of the facts of this case is contained in the decision of the Administrative Law Judge, appended to the Decision and Order of the Board, 246 N.L.R.B. No. 104 (Nov. 30, 1979).

3. The incident involved a "spill" in the Tank Washing Room, which allegedly caused Thompson to slip and fall.

4. "A." refers to the Appendix submitted in this case. There is some dispute concerning the actual date that Nulton was called into the case. The Board apparently admits, however, that the company referred the Thompson matter to Nulton after the union requested arbitration. Brief for NLRB, p. 3.

5. "ALJ" refers to the decision of the Administrative Law Judge, appended to 246 N.L.R.B. No. 104.

worked in the same area in which Thompson had been employed at the time of the February 3 incident; Whitwell was also the union steward responsible for that area.[6]

On April 21, Whitwell was called to the office of the employer's general superintendent for a meeting with company counsel. Nulton informed Whitwell that he was preparing for the forthcoming arbitration and wanted to find out what Whitwell knew of the incident involving Thompson that had occurred on February 3. ALJ 4. Whitwell was told that he was not the subject of the investigation and would not be disciplined for truthful answers, but that the company had a legal right to question him. Nulton also informed Whitwell that if he refused to answer questions posed by company counsel, he would be subject to discipline. *Id.* After consulting with Robert Reinhold, counsel for the union, Whitwell decided to answer "under protest." *Id.*[7]

After Whitwell's interview was concluded, Nulton similarly attempted to question employee Rittermeyer. When Rittermeyer expressed reluctance to answer questions about the Thompson matter, he was told by Nulton that he would be suspended or discharged if he refused to do so. ALJ 5. As a result of this threat, Rittermeyer responded to Nulton's questions. *Id.*

The questioning of Whitwell and Rittermeyer was purely factual in nature, concerning solely the events that occurred at the plant on February 3. A. 94–97, 104–05.[8] Neither employee was asked whether he would testify at the upcoming arbitration, or whether he had been requested to testify. A. 105–06. Nor were the employees questioned concerning statements that had been given to the OSHA investigator. A. 111.

After the interviews were concluded, the union filed an unfair labor practice charge, alleging that the company had violated Section 8(a)(1) of the Act[9] by threatening employees with disciplinary action "because of their engaging in concerted activity." ALJ 1. A complaint was issued by the Regional Director of the Board, and a hearing was conducted before Administrative Law Judge Josephine Klein.

---

6. Under the terms of the collective bargaining agreement, Whitwell was to serve as Thompson's representative in the first two steps of the grievance procedure. ALJ 14.

7. In the course of the interview, Whitwell revealed that he had taken contemporaneous notes of the Thompson matter. Nulton "ordered" Whitwell to produce the notes (ALJ 4); Whitwell refused "because it was [his] union notebook." *Id.* The ALJ found that Whitwell reasonably could not have interpreted the "order" as anything other than a threat that he would be disciplined for failing to turn over the notes. *Id.* Whitwell did not produce the notes; no disciplinary action, however, was taken. A. 123.

8. At the hearing before the Administrative Law Judge, the following exchange took place between Whitwell and Board Counsel Waers:

Q [Waers]. What did he [Nulton] ask you questions about?
A [Whitwell]. He just asked me questions pertaining to the Paul Thompson case, the happenings on February the third pertaining to the spill, Mr. Thompson's cleaning of the spill[,] of the conversations taking place between myself, Mr. Thompson, Mr. Malott, Mr. Wollery.

A. 26. Similarly, between Waers and Rittermeyer:
Q [Waers]. And what did he [Nulton] ask you questions about, just briefly?
A [Rittermeyer]. The spill and how I cleaned it up and if there were tanks on racks or whatever.
A. 57.

9. 29 U.S.C. § 158 (1976):
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title[.]
Section 157 (§ 7 of the Act) provides:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
29 U.S.C. § 157 (1976).

At the hearing, Nulton explained his insistence on questioning Whitwell and Rittermeyer. As described by Administrative Law Judge Klein:

> Nulton testified that he had not been consulted until after Respondent had lost the unemployment compensation case and had been fined by OSHA. Although there had been hearings in the compensation case, the OSHA investigation had been confidential. It was known that OSHA had spoken to Whitwell and Rittermeyer, but Respondent's representatives had *no inkling* of what the employees had said. Nulton said he believed he could successfully handle the matters involved in the unemployment compensation case, but he felt he needed to know what Whitwell and Rittermeyer had told OSHA because OSHA rarely issued citations or imposed fines without sound reason.

ALJ 5. Nulton testified that he sought the information in an attempt to determine whether the case should be settled. A. 80. Nulton stated further that there "very definitely" had been occasions when he had convinced employer clients to settle cases after arbitration had been set but before a hearing had been conducted. A. 78.

The Administrative Law Judge *found a* violation of Section 8(a)(1) as charged. The ALJ concluded that "Respondent improperly coerced employees Rittermeyer and Whitwell when it threatened them with discipline if they refused to cooperate by providing information to Respondent in the course of its preparation for arbitration of employee Thompson's discharge." ALJ 14. In addition, as an alternative holding, the ALJ stated that, "[e]ven if it were to be held that employees generally may not refuse to be interviewed by their employers in preparation for arbitration of a grievance, such rule could not appropriately be applied to Whitwell, who was the shop steward in Thompson's department." *Id.*

The ALJ thus found the interrogation of Whitwell to be an independent violation of the Act.

Upon the filing of exceptions the Board concluded that "[w]e agree with the Administrative Law Judge that Respondent violated Section 8(a)(1) of the Act by threatening employees Jesse Whitwell and Douglas Rittermeyer with suspension and or discharge if they refused to respond to questions posed by Respondent's counsel relating to a grievance proceeding which was scheduled for arbitration." *Cook Paint and Varnish Co.*, 246 N.L.R.B. No. 104 at 1–2 (Nov. 30, 1979) (footnote omitted). The Board opinion states what appears to be a blanket or *per se* rule that

> an employer that seeks to compel its employees to submit to questioning in such circumstances violates Section 8(a)(1).

*Id.* at 3.[10] Since the Board found that *all* employees are protected from such questioning, the Board found it "unnecessary to pass on the question of whether a union steward is entitled to different treatment in the type of situation presented here than are employees generally." *Id.* at 2 n.2. The Board thus did not adopt the alternative holding of the ALJ.

## II. GENERAL RIGHTS TO INFORMATION UNDER THE NATIONAL LABOR RELATIONS ACT

### A. *Introduction*

The Board has established in this case what appears to be a *per se* rule that an employer is barred by Section 8(a)(1) of the Act from using a threat of discipline to obtain information from an employee concerning a matter that has been set for arbitration pursuant to a contractual grievance-arbitration procedure. The right of an employer to interview employees during the pendency of an arbitration hearing has never been addressed by the courts. Before turning to this novel question, however, it

---

10. Member Truesdale, concurring, described the Board decision as announcing "a blanket rule that an employer may not, under any circumstances, threaten to discipline, or discipline, an employee for refusing to participate in an interview concerning a work-related incident once the employer has disciplined the participants in the incident and the grievance machinery has been invoked." 246 N.L.R.B. No. 104 at 6.

may be helpful to note briefly certain established tenets concerning general rights of parties to obtain information under the National Labor Relations Act.

### B. The General Duty to Furnish Information In the Context of Collective Negotiations and Grievance Handling

The Supreme Court has rejected a rule that would automatically result in a finding of bad-faith bargaining under Sections 8(d) and 8(a)(5) of the Act whenever an employer rejects a request from a union for information related to collective negotiation.[11] Rather, the Court has held that "[e]ach case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956). Nevertheless, as a general proposition, it is well-accepted that, "if [an] employer is in possession of information which is necessary or relevant to the union in discharging its function as bargaining representative, the employer will normally be required to turn over that information upon request of the union." Gorman, Basic Text on Labor Law 409 (1976).

A similar rule has developed in the context of grievance handling. In *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967), the Court enforced a decision of the Board that an employer violated the duty to bargain by refusing to furnish requested information that would allow a union to decide whether or not to process a grievance to arbitration. This decision was held to be consistent with "the national labor policy favoring arbitration." 385 U.S. at 439, 87 S.Ct. at 569. As explained by the Court:

Arbitration can function properly only if the grievance procedures leading to it can sift out unmeritorious claims. For if all claims originally initiated as grievances had to be processed through to arbitration, the system would be woefully overburdened. Yet, that is precisely what the respondent's restrictive view would require. It would force the union to take a grievance all the way through to arbitration without providing the opportunity to evaluate the merits of the claim.

*Id.* at 438, 87 S.Ct. at 569.

The duty of an employer to furnish information relevant to the processing of a grievance does not terminate when the grievance is taken to arbitration. In *Timken Roller Bearing Co. v. NLRB*, 325 F.2d 746 (6th Cir. 1963), *cert. denied*, 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964), the court considered a union request for information concerning five grievances that awaited hearings before a chosen arbitrator. The employer refused to disclose the information, and was found by the Board to have violated Section 8(a)(5). The Sixth Circuit enforced the order of the Board, stating that the union had a statutory right to obtain the information pursuant to the duty to bargain requirement of Section 8(d) of the Act.

In *Fawcett Printing Corp.*, 201 N.L.R.B. 964 (1973), the Board similarly affirmed, without comment, the rulings, findings, and conclusions of an Administrative Law Judge that an employer violated Section 8(a)(5) by refusing to comply with a demand for information in connection with a grievance scheduled for arbitration. The company had argued that the union's agreement to submit the grievance to arbitration

---

11. Section 8(d) provides in relevant part:

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession[.]

29 U.S.C. § 158(d) (1976). Violation of this duty to bargain collectively is made an employer unfair labor practice by § 8(a)(5) of the Act, and a union unfair labor practice by § 8(b)(3).

deprived it of any right that it otherwise may have had to obtain the information. The ALJ rejected this argument, stating that "the statute has been interpreted to require the provision, after as well as before a grievance has been submitted to arbitration, of requested information necessary to its intelligent evaluation and processing." 201 N.L.R.B. at 972.

The Administrative Law Judge went on to explain the decision in *Fawcett* at length, in part as follows:

> Like requiring the production of such information during earlier stages of the grievance procedure, requiring its production on request made after arbitration has been sought, "[f]ar from intruding upon the preserve of the arbitrator," would "aid ... the arbitral process" (*Acme, supra,* 385 U.S. at 438 [87 S.Ct. at 569]). Thus, here, as in *Acme,* the burden on the arbitral system would be lessened if information provided by Respondent either persuaded the [union] that its grievance lacked merit and should be dropped, or induced the [union] to offer a compromise which might prove acceptable to Respondent. Indeed, the entire class of cases which impose the duty to provide relevant information are based on the view that such information will contribute to the resolution of industrial differences by mutual agreement—a principal statutory purpose. Fulfillment of this purpose would be impeded by withdrawing from the parties at any stage the rights and duties calculated to promote the possibilities of settlement.

201 N.L.R.B. at 972. The ALJ further observed that disclosure was necessary because provisions governing the grievance-arbitration process may substantially limit the time available for investigation before a decision must be made whether to take a grievance to arbitration, and because skilled and sophisticated representatives of the parties may not become involved in the case until the later stages of the arbitration process. *Id.* Thus, "the period during which Respondent would exclude any duty to provide information might well be the very period during which its provision might contribute the most toward settlement of the grievance without arbitration." *Id.*[12] Finally, it is significant to note that the ALJ in *Fawcett* expressly rejected a contention of the employer that "the adversary nature of arbitration proceedings" renders inappropriate the requirement that relevant information be supplied. *Id.*

Not surprisingly, the general duty to furnish information also has been held to impose certain obligations on unions—as well as employers—during the course of collective bargaining. In *Local 13, Detroit Newspaper Printing and Graphic Communications Union v. NLRB,* 598 F.2d 267 (D.C. Cir.1979), this court enforced a decision of the Board that a union violated its duty to bargain by refusing to disclose certain information requested by the employer during the course of contract negotiation. The court noted that an employer has a duty to disclose relevant information to a union upon request, and stated that a union is "likewise obliged" to furnish the employer with relevant information. 598 F.2d at 271.[13]

The Board also has held that an employee must furnish information to an employer during an investigation of alleged employee misconduct. As the Board recognized in the present case, "the Board has previously found that an employer can, without violating Section 8(a)(1), seek to compel its em-

---

**12.** The ALJ also noted that production of relevant information after the case has been submitted to arbitration would assist the parties in preparing the case for arbitration and thereby tend to shorten the arbitration hearing and to make the evidence received at the hearing more complete. 201 N.L.R.B. at 972.

**13.** In *Tool and Die Makers' Lodge No. 78,* 224 N.L.R.B. 111 (1976), an Administrative Law Judge found that a union violated § 8(b)(3) by refusing to furnish information requested during a grievance proceeding. The Board assumed "arguendo," without deciding, that a union's duty to furnish information is parallel to that of an employer. The Board declined to adopt the findings and conclusions of the ALJ, however, on the ground that it had not been established that the information requested was relevant to the bargaining process.

ployees to submit to questioning concerning employee misconduct when the employer's inquiry is still in the investigatory stage and no final disciplinary action has been taken." 246 N.L.R.B. No. 104 at 2. *Service Technology Corp.*, 196 N.L.R.B. 845 (1972); *Primadonna Hotel, Inc.*, 165 N.L.R.B. 111 (1967). As explained by an Administrative Law Judge in *Service Technology*:

> [A] proper balance must be struck between the Company's right to uncover improper conduct on the part of certain employees in its endeavors to maintain order in its business and the rights of those employees. I find in these circumstances that no right accrued to the employees under the Act, which protected their refusal to talk or to remain uncooperative, and that, therefore, these threats were not violative of the Act.

196 N.L.R.B. at 847.

### C. *Board Deference to Arbitral Judgments Regarding the Duty to Disclose Information In Grievance Handling*

In *Pacific Southwest Airlines, Inc.*, 242 N.L.R.B. No. 151 (June 14, 1979), the Board considered a case virtually identical to the present action. In *Pacific Southwest*, as in the present case, an employer's attorney attempted to interview two employees before a scheduled arbitration hearing, in order to prepare for the arbitration and to review the employer's position. The two employees refused to be interviewed, and consequently were suspended and thereafter discharged. The union filed grievances to protest these discharges, and pursued the grievances to arbitration. Following a hearing, the arbitrator found that the employer had acted within its rights in attempting to interview the employees, and that disciplinary action therefore was justified.[14]

Following the completion of the arbitration, the union filed an unfair labor practice charge alleging that the disciplinary action taken violated Section 8(a)(3) of the Act. A complaint was issued by the Regional Director, but the Board dismissed this complaint. Under the principles of *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955), both the Administrative Law Judge and the Board deferred to the decision of the arbitrator that the disciplinary action taken by the employer was lawful.[15] The Board explained its decision to defer as follows:

> The arbitrator found that [the employees] were the witnesses to the drinking incident whose interviews had been the basis of Respondent's action to the incident; that, as an almost routine practice, a party to arbitration interviews its witnesses in preparation for the hearing to permit, as here, its attorney to view the evidence first hand and to assess the evidence in light of a possible settlement; that Respondent sought to question on-duty employee witnesses about the conduct of other on-duty employees during the drinking incident; and that therefore Respondent had the right to expect good-faith cooperation. The arbitrator also found that Respondent did not seek disclosure of what [the employees] would testify to at the hearing or the details of the Union's position; that Respondent did not go beyond legitimate inquiry into job-related conduct; that the interviews were not coercive; and that therefore Respondent did not wrongfully intrude upon or interfere with the grievance procedure. *For the above reasons* and those set forth in detail by the Administrative Law Judge, we find that the arbitration award with respect to the suspensions of [the employees] is not repugnant to the purposes and policies of the Act and fully meets the *Spielberg* standards for deferral.

---

14. The arbitrator determined, however, that the discharges should be converted to suspensions. The two employees were awarded reinstatement without any retroactive compensation.

15. Under *Spielberg*, the Board will defer to an arbitration award where the proceedings appear to have been fair and regular, all parties have agreed to be bound, and the decision of the arbitrator is not clearly repugnant to the purposes and polices of the Act. 112 N.L.R.B. at 1082.

242 N.L.R.B. No. 151 at 4–5 (footnote omitted; emphasis supplied).

Because of these reasons cited in *Pacific Southwest*, the Board held that a decision of an arbitrator that an employer had an enforceable right to interview employees the day before a scheduled arbitration hearing was not repugnant to the purposes and policies of the Act. In the present case, however, the Board rejected those same reasons and established a "blanket rule" that such employer conduct violates Section 8(a)(1) of the Act.

The company advances two principal arguments in support of its contention that the decision of the Board in the present case is improper. First, the company asserts that under the duty to bargain requirement of Section 8(d) of the Act, Whitwell and Rittermeyer had an obligation to furnish the company information relevant to the pending arbitration. Second, the company contends that there is no substantial evidence to support the Board's finding that the employer conduct at issue here violated Section 8(a)(1). Against the background of the established principles described above, we turn to consider these arguments.

## III. PRE–ARBITRATION INTERVIEWS AND SECTION 8(a)(1)

In considering the decision of the Board in this case, we emphasize at the outset that "[t]he function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *NLRB v. Truck Drivers Local 449*, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957). As further provided by Section 10(e) of the Act:

The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.

29 U.S.C. § 160(e) (1976). Moreover, this court has stressed very recently that the Board possesses an unmatched expertise in distilling and identifying the coercive effects of employer conduct. *United Steelworkers v. NLRB*, 646 F.2d 616 at 629 (D.C.Cir. 1981).

At the same time, the Supreme Court has made clear that "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).[16] This court has refused to enforce orders of the Board that have not been supported by substantial evidence. *Midwest Regional Joint Board v. NLRB*, 564 F.2d 434 (D.C.Cir. 1977); *Local 433, United Brotherhood of Carpenters v. NLRB*, 509 F.2d 447 (D.C.Cir. 1974).[17]

The Board in the present case has established a *per se* rule that an employer may never use a threat of discipline to compel employees to respond to questions relating to a grievance proceeding that has

---

**16.** The Supreme Court also stated in *Universal Camera*:

We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

340 U.S. at 490, 71 S.Ct. at 466.

**17.** *See also International Brotherhood of Electrical Workers v. NLRB*, 487 F.2d 1143 (D.C. Cir. 1973) (*en banc*), *affirmed, Florida Power & Light Co. v. Electrical Workers Local 641*, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974).

been scheduled for arbitration. Upon a careful examination of the record, we are unable to find substantial evidence to support this finding. As set forth more fully below, pre-arbitration interviews are a matter of routine practice in many sectors of industrial relations. In these sectors, investigatory interviews are conducted by advocates in preparation for a pending arbitration without any infringement of protected employee rights. Indeed, although the Board has been in existence for nearly a half century, and private arbitration for almost as long, we are unaware of any prior Board or judicial decision even suggesting that *all* pre-arbitration interviews are *per se* coercive of employee rights under the Act.

We believe that the rule announced by the Board in the present case unnecessarily and impermissibly interferes with the manner in which parties to a collective bargaining relationship structure the arbitration process. As a result, we hold that the legality of pre-arbitration interviews is generally a *contractual* matter to be determined by the parties in establishing a grievance-arbitration procedure, subject only to the normal restraints imposed by the Act that employer conduct not be unlawfully coercive in a particular case.

The prevalence of pre-arbitration interviews has been noted by one of the industry's most preeminent arbitrators. In the arbitration case preceding the Board decision in *Pacific Southwest Airlines, supra,* Professor Edgar A. Jones, Jr., a professor of labor law and evidence at UCLA Law School and President-elect of the National Academy of Arbitrators, observed in his opinion that:

It is almost routine for a union or an employer advocate—lawyer or not—to go to the locale of a pending arbitration a day or two before a scheduled hearing in order to interview witnesses and plan the details of the morrow's presentation. It is not at all unusual for that pre-hearing occasion to be the first time that the advocate has had the chance to get first-hand accounts of witnesses, to identify possible discrepancies among their accounts, to press them as a cross-examiner is apt to, to observe their demeanor and evaluate their credibility, to assess the potential influence on the course of the hearing of what they have to say and how they are apt to say it in the context of the hearing.

Contrary to the impression expressed by the Union representatives and the potential witnesses in this case, that kind of encounter immediately before a hearing is simply not in itself a "dirty pool" situation. Instead, it is an important part of the administration of the grievance procedure. It is by no means unusual for cases to be settled on the day—or even the hour—before the hearing is to convene based on the advocate's last-minute, eye-opened assessment of the significance of these pre-hearing contacts.

*Pacific Southwest Airlines, Inc.,* 242 N.L.R.B. No. 151 (June 14, 1979), Appendix A to decision of Administrative Law Judge, at 14.[18] In *Pacific Southwest,* both the Ad-

---

**18.** Professor Jones has more than twenty-five years of experience as a labor arbitrator. *See, e. g., Douglas Aircraft Co.,* 28 Lab. Arb. 198 (1957). In addition, Jones is a prolific labor arbitration scholar. As a sample of his legal writings, *see* Jones, *"Truth" when the Polygraph Operator Sits as Arbitrator (or Judge): The Deception of "Detection" in the "Diagnosis of Truth and Deception,"* Proceedings of the Thirty-First Annual Meeting, National Academy of Arbitrators (BNA, Inc. 1979); Jones, *The Accretion of Federal Power in Labor Arbitration—The Example of Arbitral Discovery,* 116 U.Pa.L.Rev. 830 (1968); Jones, *Blind Man's Buff and the NOW-Problems of Aprocrypha, Inc. and Local 711—Discovery Procedures in Collective Bargaining Disputes,* 116 U.Pa.L. Rev. 571 (1968); Jones, *Evidentiary Concepts in Labor Arbitration: Some Modern Variations on Ancient Legal Themes,* 13 U.C.L.A.L.Rev. 1241 (1966); Jones, *Autobiography of a Decision: The Function of Innovation In Labor Arbitration and the* National Steel *Orders of Joinder and Interpleader,* 10 U.C.L.A.L.Rev. 987 (1963); Jones, *Arbitration and the Dilemma of Possible Error,* 11 Lab. L.J. 1023 (1960); Jones, *Specific Enforcement of "Hot Cargo" Provisions In Collective Bargaining Agreements by Arbitration and Under Section 301(a) of the Taft-Hartley Act,* 6 U.C.L.A.L.Rev. 85 (1959); Jones, *Labor Arbitration and Stare Decisis:*

ministrative Law Judge and the Board made reference to these findings of Professor Jones in concluding that his decision that an employer has an enforceable right to conduct pre-arbitration interviews was not repugnant to the purposes and policies of the Act.

Given this practice in industrial relations, acknowledged by the Board in *Pacific Southwest,* we do not believe that the Board in the present case has established by substantial evidence that an employer demand for a pre-arbitration interview coerces employees in the exercise of protected legal rights. At that interview, an employer advocate may, perhaps for the first time, obtain factual information from witnesses, observe demeanor, and in general evaluate the merits of a pending dispute. On the basis of the record established by the Board, we are unable to perceive the manner in which such a limited investigation coerces protected employee rights. As a result, we hold that an employee does not have an automatic right to refuse to respond to questions concerning a matter that has been scheduled for arbitration.

This decision is consistent with the fundamental nature of the arbitration process. Arbitration is a matter of *contract* between the parties, noted for its flexibility and informality. *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The Supreme Court has stated that "it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution." *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 58, 94 S.Ct. 1011, 1024, 39 L.Ed.2d 147 (1974). As noted in Abrams, *The Integrity of the Arbitral Process,* 76 Mich.L.Rev. 231, 235 (1977), "[a]rbitration procedure remains,

for the most part, a matter of the parties' choice." [19]

Into this flexible and informal process, the Board here has injected a fixed law of procedure that an employer may not, under any circumstances, conduct a compulsory investigatory interview in preparation for a pending arbitration. As noted above, this rule is contrary to the practice established by the parties under many collective bargaining relationships. We do not believe that the Board has presented sufficient evidence to justify this interference with the arbitral process.

Counsel for the Board has made a somewhat extraordinary, and gratuitous, suggestion that:

> The most favorable time for settling grievances is at the outset, before the parties' positions have hardened; and the most favorable situation for settlement is where the parties have come to share a complete and comprehensive view of the relevant circumstances. *An employer may be spurred to a painstaking investigation at the outset if he knows that further investigation is restricted once a grievance is headed for arbitration.*

Brief for NLRB, p. 13 (emphasis supplied). This suggestion is extraordinary because it fails to comprehend that it is not the function of the Board to structure the manner in which parties to a collective bargaining agreement process and resolve contract grievances. Just as the Board may not decree the time in which a party must respond to a filed grievance, the Board may not attempt to spur an employer to "a painstaking investigation at the outset" once a grievance is filed. The method in which disputes are resolved through a grievance-arbitration process is a contractu-

---

Some Introductory Comments, 4 U.C.L.A.L. Rev. 657 (1957).

**19.** The Supreme Court stated in *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960):

> Section 203(d) of the Labor Management Relations Act, 1947, 61 Stat. 154, 29 U.S.C. § 173(d), states, "Final adjustment by a method agreed upon by the parties is hereby

declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement...." That policy can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.

363 U.S. at 566, 80 S.Ct. at 1345.

al matter to be determined by the parties. The Board may not construct an inflexible rule that any compulsory interview conducted in preparation for a pending arbitration violates the Act.

In so holding, we do not suggest that limits do not exist on the permissible scope of a legitimate pre-arbitration interview. An employer may in certain cases be forbidden from inquiring into matters that are not job-related. An employer also may be prohibited from prying into union activities, or using the interview as an excuse to discover the union strategies for arbitration. In short, we do not here suggest that employers have a carte blanche license to interrogate employees prior to arbitration; the limits provided by Section 8(a)(1) remain available to prohibit coercive employer conduct in an individual case.

Similarly, the parties to a collective bargaining agreement may themselves decide, in establishing a grievance-arbitration procedure, that investigatory interviews will *not* be allowed prior to arbitration, or indeed at any time during the grievance resolution process. As emphasized above, the structure of a grievance-arbitration process is a matter of *contract* to be determined by the parties.[20]

Our decision here is consistent with decisions of the Supreme Court and the Board requiring the disclosure of information in order to further the efficacy of the arbitral process. As suggested by the Supreme Court in *NLRB v. Acme Industrial Co., supra*, for arbitration to be most effective, mechanisms must exist that sift out unmeritorious claims. In *Fawcett Printing Corp., supra*, the Board affirmed a conclusion of an Administrative Law Judge that the statutory goal of mutual agreement as the means of resolution of industrial differences "would be impeded by withdrawing from the parties at any stage the rights and duties calculated to promote the possibilities of settlement." 201 N.L.R.B. at 972. As

developed at length above, these cases have imposed upon an employer the duty to disclose information concerning a grievance both before and after the grievance has been appealed to arbitration.

The policies incorporated in these decisions do not evaporate when it is the employer who seeks information before arbitration to assess the merits of his or her case. Access to relevant information has a comparable effect on the likelihood that an employer will settle a pending dispute. In the present case, the employer's advocate, who had not been brought into the dispute until arbitration had been set, sought to evaluate the employer's position because of the fact that the company had not prevailed in two closely related proceedings. Though arbitration had been set, settlement remained a distinct possibility.

We acknowledge that this policy favoring settlement may not be fostered at the expense of protected employee rights. An employer demand for information from employees can exert pressures on those employees that are not present when a union demands information from an employer. For this reason, we do not hold that an employer has an inflexible right under Section 8(d) of the Act to seek information from employees concerning a pending grievance.[21] Interrogation of employees remains subject in each case to the limitations of Section 8(a)(1) described above. We simply note that our decision here is consistent with the strong policy announced both by the Supreme Court and by the Board favoring the peaceful resolution of industrial dispute by mutual agreement.

In addition, our decision is consistent with those cases, acknowledged by the Board in this case, that establish that an investigatory interview conducted by an employer *before* disciplinary action is taken does not violate Section 8(a)(1). *Service Technology Corp.*, 196 N.L.R.B. 845 (1972); *Primadonna Hotel, Inc.*, 165 N.L.R.B. 111

---

**20.** Violation of an agreement not to interview would of course be a violation of contract to be resolved through contractual dispute mechanisms.

**21.** We also do not consider here the extent to which individual *employees* may be subject to the duty to bargain requirement of § 8(d).

(1967). While an employer's purpose in conducting an investigatory interview before disciplinary action is taken may not always be the same as that after a grievance is filed, we fail to see that the effect on employees is materially different. We find it anomalous for the Board to suggest that an interview conducted in the former situation is protected under the Act, while the same interview conducted in the latter situation automatically violates Section 8(a)(1). In either case, we believe that an investigatory interview is permissible as long as held within the bounds of Section 8(a)(1) described above.

Finally, we believe that the Board has totally failed to reconcile this case with its earlier decision in *Pacific Southwest*. It is true that in *Pacific Southwest* the Board "deferred" to the decision of an arbitrator that an employer has an enforceable right to conduct a pre-arbitration interview. As recognized by the Board, however, such deferral is appropriate only if the arbitrator's decision is not clearly repugnant to the purposes and policies of the Act. *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080, 1082 (1955). Therefore, the decision in this case, establishing a *per se* rule, makes no sense whatsoever in the light of the Board's contrary judgment in *Pacific Southwest*. The Board has not reconciled the inconsistency between *Pacific Southwest* and the "blanket rule" announced here, as it must do. *See Local 777, Democratic Union Organizing Committee v. NLRB*, 603 F.2d 862, 871–72 (D.C.Cir. 1978); *Kohls v. NLRB*, 629 F.2d 173 (D.C.Cir. 1980).[22]

For all of these reasons, we find that the inflexible rule established in this case is not supported by substantial evidence and may not be enforced.

## IV. DISPOSITION OF THE PRESENT CASE

We have concluded that the blanket rule announced by the Board, that any compulsory pre-arbitration interview violates Section 8(a)(1), is not supported by substantial evidence and cannot stand. As part of a contractual arbitration procedure, an employer may conduct a legitimate investigatory interview in preparation for a pending arbitration. As outlined above, however, that interview may not pry into protected union activities. It is against these standards that the interviews conducted in the present case must be evaluated.

In resolving this case, we believe that it is necessary to distinguish the company's demand to interview Rittermeyer, a plant employee, from the demand to interview Whitwell, a plant union steward. While we refuse to enforce the finding of the Board that the interview of Rittermeyer violated Section 8(a)(1), we remand this case to the Board for further consideration of whether the interview of steward Whitwell violated the Act.

The record demonstrates that in the case of employee Rittermeyer, the company conducted a limited, investigatory interview concerning solely the employee's knowledge of the events that occurred on February 3 that led to the discharge of fellow employee Paul Thompson.[23] As developed above, employer counsel Nulton did not inquire as to whether Rittermeyer would testify at the upcoming arbitration, nor did he question Rittermeyer concerning the statement Rittermeyer had earlier given to OSHA. In short, Nulton conducted a legitimate inves-

---

**22.** In *Kohls*, this court refused to enforce an order of the Board, in part because the Board had failed to explain an inconsistency similar to that present here. As stated in *Kohls*:

> In *Bloom* [603 F.2d 1015 (D.C.Cir.)] the Board deferred to an arbitral judgment that the employer had not breached the collective bargaining agreement when it discharged an employee for refusing to work because he believed a truck to be unsafe. The arbitrator's finding disposed of the alleged unfair labor practice charge, apparently to the Board's satisfaction. It is difficult to understand how the Board could come to the opposite conclusion here, finding both an unfair labor practice and breach of the contract, in a case involving facts identical in all material respects to those in *Bloom*. The Board has given no rational reason for its contradictory decision in this case.
>
> 629 F.2d at 178.

**23.** *See* note 8, *supra*.

tigatory interview concerning a job-related incident in order to determine whether the company should proceed with a pending arbitration.[24] In these circumstances, the attempt by the company to compel Rittermeyer to respond did not violate Section 8(a)(1).

The questioning of Whitwell, however, must be viewed in a separate light. Had Whitwell been solely a fellow employee, as Rittermeyer, our analysis would parallel that above. However, Whitwell also served as the union steward responsible for the Thompson dispute. In her decision, the Administrative Law Judge stated, as an alternative holding, that the questioning of Whitwell violated Section 8(a)(1) because Whitwell was the shop steward in Thompson's department and was "duty bound to serve Thompson's interest." ALJ 14–15. The ALJ found that to require Whitwell to submit to an interview would place him in a

position of sharp conflict of interest. As a result of the "blanket rule" announced by the Board in this case, the Board did not adopt this alternative holding of the ALJ. As stated by the Board, "we find it unnecessary to pass on the question of whether a union steward is entitled to different treatment in the type of situation presented here than are employees generally." 246 N.L. R.B. No. 104 at 2 n. 2.

As a result of our rejection of the Board's blanket rule concerning employees, we believe that the Board must be given an opportunity to consider whether Whitwell was entitled to special protection due to his status as a union steward. As described by the ALJ, there are fundamental differences between an interview of an employee and an interview of a union steward. Most significantly, a steward may be acting pursuant to his position as a representative of the employees, responsible for processing

---

24. One piece of evidence in the record deserves comment here. In its decision, the Board stated, almost as an aside and entirely out of context, that: "Indeed, the attorney who conducted the questioning on behalf of Respondent candidly stated at the hearing that one of the reasons for the interview was to discover 'what the union's position would be if it went to arbitration.'" 246 N.L.R.B. No. 104 at 3 n. 3. As noted above, an investigatory interview may not seek to uncover the union's theory or strategy for the upcoming arbitration. We do not believe, however, that this observation by the Board requires a determination here that the interviews in this case violated § 8(a)(1).

We decide so for three reasons. First, it is critical to note that the Board in the present case did not make a *finding* that the attorney attempted to discover the union's position at arbitration; the Board merely noted, out of context, an off-hand remark by the attorney. The Administration Law Judge made no reference to this statement. Neither decision relied upon this evidence, and the Board has made no reference to it on this appeal.

Second, this statement of Nulton must be viewed in its full context. On direct examination by the company, Nulton described his involvement in, and preparation for, the Thompson arbitration. After discovering that OSHA had issued a citation based on the February 3 incident, Nulton became concerned over the merits of the company's position, and the extent to which the company was prepared for the pending arbitration. As fully stated by Nulton:

So I asked what had been done. I ascertained that nothing had been done. I then

made the suggestion that I thought somebody should interview these people to find out just what they might know as to the happenings of February the 3rd, so that 1) I would know what the union's position would be if it went to arbitration or, if the testimony was as bad as, at least, OSHA had seen it to be, that the case would be, perhaps, settled.

A. 80. It appears likely from Nulton's remarks that he sought nothing more than knowledge of what had occurred on February 3 in order to consider the propriety of settlement. In so doing, he would of course learn the strength of the case against him, or what may loosely be described as "the union's position." It simply cannot be assumed from this statement that Nulton sought to discover the union's strategy for the case.

Third, and most importantly, the actual inquiry of the employees was solely job-related and in no way sought to discover the union's position. *See* note 8, *supra*. Nulton did not inquire whether the employees would be witnesses at the arbitration, or into the content of any statement made to any other party. Absolutely no questioning was conducted concerning the union's strategy for the hearing, or its proposed legal theory.

For these reasons, we conclude that there is no substantial evidence to support a finding that Nulton sought to use the interviews to discover the union's position at the upcoming arbitration. We thus refuse to find a violation of § 8(a)(1) based on this limited out of context statement made by company counsel.

the grievance at issue. To require collective bargaining *representatives* to submit to compulsory interviews might seriously infringe on protected activity. Since the Board explicitly chose not to consider this question, however, we remand this case to the Board for further proceedings on this issue.

In remanding, we do not mean to suggest that a "blanket rule" concerning union stewards is any more appropriate than a "blanket rule" concerning employees. For example, a union steward who has no representational responsibilities in a particular case, or one who may be directly involved in alleged acts of misconduct, may not be entitled to any special protection. *See* ALJ 15 n. 22; *see also Service Technology Corp.,* 196 N.L.R.B. 845 (1972). We simply note that very different considerations may be relevant in considering the legality of an interview of a union steward that are not present in the case of employees generally.

Enforcement of the order of the Board is denied. The case is remanded for further proceedings consistent with this opinion.[25]

*So ordered.*

ROBB, Circuit Judge, dissenting in part:

I concur in Judge Edwards' opinion except that I would not remand to the Board the matter of the Steward Whitwell.

On the remand the Board of course will be required to reach a conclusion based on the evidence in the record. In my judgment however there is nothing in the record to suggest that Whitwell was entitled to special protection because of his status as a

**25.** Judge Wright has set forth at length some dissenting views in this case. We simply wish to note the fundamental difference between the position taken by the majority and that advanced by Judge Wright in this case. Essentially, we view pre-arbitration interviews as an integral part of the grievance-arbitration process; Judge Wright apparently does not. Given our assumption that pre-arbitration interviews are part of the grievance-arbitration process, it clearly follows that whether an opposing witness may be interviewed prior to arbitration is a matter to be decided by the parties, and not by Board rule. The Supreme Court has stated unequivocally that arbitration is a matter of contract, and that contractual matters are to be resolved without interference from the Board. In *NLRB v. C & C Plywood Corp.,* 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967), the Court stated:

> To have conferred upon the National Labor Relations Board generalized power to determine the rights of parties under all collective agreements would have been a step toward governmental regulation of the terms of those agreements. We view Congress' decision not to give the Board that broad power as a refusal to take this step.

385 U.S. at 427–28, 87 S.Ct. at 563.

As recognized by Professor Jones, "[i]t is almost routine for a union or an employer advocate—lawyer or not—to go to the locale of a pending arbitration a day or two before a scheduled hearing in order to interview witnesses and plan the details of the morrow's presentation." Parties clearly have felt free to determine that an opposing witness may be interviewed before a scheduled arbitration. In addition, we find that the lack of precedent in this area is further evidence that parties have viewed this issue as one to be determined by contract. The institution of labor arbitration is nearly as old as the NLRA itself, yet not one case has been cited in which this issue has been taken previously to the Board. The question of whether an opposing witness may be interviewed prior to arbitration has been viewed as a matter to be decided pursuant to collective bargaining, and not by a *per se* Board rule. We see no reason to change that practice.

Judge Wright relies heavily on a long line of cases that have prohibited employer interrogation of an employee during the pendency of a case scheduled for a hearing before the NLRB. *See* Statement of Judge Wright, *infra,* p. 730 n. 29. There is a critical difference, however, between cases set before the NLRB and cases set for arbitration. Proceedings before the NLRB are instituted to protect employee rights arising under the National Labor Relations Act. Proceedings before an arbitrator are instituted to resolve contractual disputes arising under a collective bargaining agreement. As stated above, it is for the parties to determine the manner in which *contractual* disputes are resolved.

We again emphasize that an employer may not overstep the bounds of an investigatory pre-arbitration interview and pry into protected activity. The Board retains the authority to declare that such conduct is unlawful. In light of the traditions of collective bargaining in this country, however, we do not believe that the Board has the authority to announce a *per se* rule prohibiting all investigatory pre-arbitration interviews. Since the Board has advanced no reasoning or analysis in this case other than that all pre-arbitration interviews are unlawful, the order of the Board may not be enforced.

union steward. As Judge Edwards points out the questioning of Whitwell "was purely factual in nature, concerning solely the events that occurred at the plant on February 3." (Op., at 714). In other words Whitwell was interviewed simply as a witness, not as a steward, and the questioning had nothing to do with his activities or functions as a steward. On these facts I think Whitwell's status as a steward did not insulate him from his duty to disclose what he knew about the incident of February 3.

J. SKELLY WRIGHT, Circuit Judge, dissenting:

In discovery interviews conducted after a dispute had been submitted to binding arbitration, the Cook Paint & Varnish Company coerced two employees to answer questions and threatened one with discipline for refusing to produce a union notebook. The National Labor Relations Board (NLRB or Board) held this action to constitute an unfair labor practice under Section 8(a)(1) of the National Labor Relations Act (NLRA).[1] This court today sets aside the decision of the Board. As an integral part of its reasoned opinion the Board articulated a rule of decision that would have clarified the rights of employees in similar cases—a rule that would have protected employees from coercive interview and discovery techniques after resort to arbitration had established an adversary relationship between labor and management. This court today strikes down that rule, holding that employer threats and other coercion may produce desirable results, such as promoting settlement of disputes slated for arbitral resolution. Unable to agree with either the majority's reasoning or its conclusions, I dissent.

In my view, the majority's opinion is based on an improvident and unwarranted construction of the Board's announced rule

of decision. Reading that rule more broadly than is required by the context of its assertion, the majority holds it to be inconsistent with the letter and policies of the NLRA; finding the Board's order against Cook to be based largely on that rule, the court denies the Board's petition for enforcement. I regard the majority opinion as a premature decision against the rule's validity that produces a wrong result on the instant facts and unnecessarily restricts the authority of the Board to protect important rights of employees under the NLRA. Reading the Board's decision much more narrowly, I would uphold its articulated rationale as applied to the facts of this case. The Board's announced rule of decision was supported by both a reasoned explanation and substantial evidence. Moreover, there are important benefits to be derived from the Board's articulation of a rule-like *ratio decidendi*, which provides much clearer guidance to interested parties than would an *ad hoc* balancing of factors peculiar to a particular controversy. In the absence of a clear rule defining their rights, employees may possess no rights effectively enforceable against employers bent on coerced extraction of privileged information. I cannot agree that the NLRA denies the Board the authority to develop enforceable standards. The Board should be given the opportunity to do so, including the opportunity to construe its own rule, and perhaps to limit it if necessary, in future cases.

I

A.

The issues presented by this case involve inter-relationships among at least three provisions of the National Labor Relations Act: Section 7, Section 8(a)(1), and Section 8(d).

Section 7 of the NLRA[2] guarantees the right of employees "to engage in * * * con-

1. 29 U.S.C. §§ 151–169 (1976).

2. Section 7, 29 U.S.C. § 157 (1976), provides: Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to

engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition

certed activities for the purpose of * * * mutual aid or protection * * *." It is established that Section 7 protects an employee's participation in grievance and arbitration proceedings.[3] An employer may not seek to deter an employee from involvement in such proceedings, nor may an employer sanction an employee for giving adverse testimony. Both the courts and the NLRB have also held that employees' Section 7 rights to make common cause would sometimes encompass a right to decline to give testimony adverse to the interests of one or more of their fellows.[4]

Section 8(a)(1) of the NLRA[5] prohibits employers from engaging in "unfair labor practices." The section states explicitly that it shall be "an unfair labor practice" for an employer to "interfere with, restrain, or coerce employees in the exercise of rights guaranteed" by Section 7.[6]

Section 8(d) of the NLRA[7] imposes a duty on "the representative of employees" as well as on employers to "confer in good faith with respect to wages, hours, and other terms and conditions of employment * * *." Despite the Section 7 right of employees to engage in concerted activity for mutual protection, the NLRB has inferred from this and other sections of the Act an employer's right to require employee cooperation in investigations of mishaps and misbehavior in the workplace. The employer has a legitimate interest in maintaining discipline, order, and safety in his place of business.[8] And, in a limited range of cases, the NLRB has upheld an employer's use of coercive interviews to secure information needed to protect this interest.[9]

### B.

In the instant case the NLRB was called upon to strike a balance between protection of employee rights to engage in concerted activity, secured under Section 7, and preservation of employer interests in attaining information about possible employee misconduct.[10] In the context of an arbitration proceeding, the fourth and most formal level of dispute resolution procedure provided by the collective bargaining agreement,[11] two employees asserted a Section 7 right to refuse participation in pre-arbitral interviews conducted by the employer. The employer proceeded to coerce their cooperation by threatening them with suspension or other retaliation. The union thereupon invoked the jurisdiction of the NLRB, charging the employer with commission of unfair labor practices under Section 8(a)(1). In

---

of employment as authorized in section 158(a)(3) of this title.

**3.** *See, e. g., Keokuk Gas Service Co. v. NLRB*, 580 F.2d 328, 333–334 (8th Cir. 1978); *Daphne San Francisco Funeral Service*, 224 NLRB 461, 463 (1976).

**4.** Conduct of coercive discovery interviews during the pendency of a case before the NLRB has repeatedly been held to violate employee rights under § 7. *See, e. g., International Union, United Automobile, etc. Wkrs of America v. NLRB*, 392 F.2d 801, 809 (D.C. Cir. 1967), *cert. denied*, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968); *Joy Silk Mills, Inc. v. NLRB*, 185 F.2d 732, 743–744 (D.C.Cir. 1950); *Johnnie's Poultry Co.*, 146 NLRB 770, 775 (1964), *enforcement denied*, 344 F.2d 617 (8th Cir. 1965). A similar recognition that § 7 provides employees at least a *prima facie* right to resist discovery interviews in the arbitration context is implicit in the NLRB's balancing of employer interests against employee rights in right-to-information cases. *See Service Technology Corp.*, 196 NLRB 845, 847 (1972); *Primadonna Hotel Inc.*, 165 NLRB 111 (1967).

**5.** 29 U.S.C. § 158(a)(1) (1976).

**6.** *Id.*

**7.** 29 U.S.C. § 158(d) (1976).

**8.** *See Service Technology Corp., supra* note 4; *Cross Baking Co.*, 186 NLRB 199 (1970).

**9.** *See Service Technology Corp., supra* note 4; *Primadonna Hotel Inc., supra* note 4.

**10.** *Cook Paint & Varnish Co.*, 246 NLRB No. 104 at 2 (Nov. 30, 1979), *reprinted in* Appendix (App.) 198, 199. The Decision and Order of the Board (Decision of the Board) affirmed "the rulings, findings, and conclusions of the Administrative Law Judge [ALJ]," *id.* at 1, App. 198, whose opinion (ALJ Opinion) asserted the need to engage in a balancing of statutory interests. *See* ALJ Opinion, *reprinted at* App. 173, 179 & n.7.

**11.** ALJ Opinion, *supra* note 10, at 3, App. 175.

defense the employer argued that its threats of punishment were not unfair within the meaning of the statute, because they were necessary to vindicate legitimate employer interests.

In a careful and detailed opinion an Administrative Law Judge (ALJ) held that the coercive interviews conducted by the employer constituted "unfair labor practices" condemned by the National Labor Relations Act.[12] The ALJ reached her decision by articulating a general legal principle, itself reached through a balancing of statutory interests and policies, that applied to the largely undisputed facts. The ALJ's opinion recognized the employer's legitimate interest in obtaining information about employee misconduct and necessary discipline. It dealt carefully and thoroughly with prior cases in which coercive procedures to obtain such information had been upheld.[13] According to the ALJ, the prior cases decided on their merits by the Board and by the courts had all involved attempts by an employer, in the context of an investigatory effort, to obtain information helpful in determining whether discipline was appropriate.[14] Neither the Board nor the courts had stated rules for determining the propriety of coercive interviewing in the context of an arbitration proceeding. And, the ALJ observed, pre-arbitral interrogations are importantly different from the kinds of investigatory interviews considered in other cases. By the time a dispute reaches arbitration, the employer has already taken a decision to impose disciplinary sanctions; his investigation of the facts underlying the grievance has presumably come to an end; the context is irreducibly adversary. Based on these considerations the ALJ determined that arbitration represented an appropriate point for linedrawing in defining the Section 7 rights of employees under the Act:

> There obviously is a world of difference between an employer's trying to obtain factual information helpful in determining whether an employee should be disciplined, on the one hand, and, on the other hand, his attempting to obtain information to justify discipline already imposed. In the former case, the employer is legitimately concerned about maintaining order in the operation of his business; in the latter case, he is concerned only to vindicate action he has already taken. In the former case, an employee's statutory right to make common cause with his fellow employees may well have to yield to the more urgent need of orderly conduct of the business, a necessity to management and labor alike; in the latter case, however, there is no apparent reason why an employer's vindication of action he has already taken should be allowed to override the employees' concern for solidarity. * * * [15]

On administrative appeal the NLRB explicitly adopted the ALJ's conclusions regarding coercive interviews in the arbitration context.[16] Its short opinion also included an independent statement of justification for the principle that a line was appropriately drawn at this point:

> In [prior] cases, we have been required to balance the right of employees to make common cause with their fellow employees against the need for an employer to maintain the orderly conduct of its business. Where the employer's questioning takes place in an investigatory context

---

12. ALJ Opinion, *supra* note 10. The ALJ also held, as an alternative ground, that the company was barred from compelling testimony from one of the employees, a union steward, because of the latter's quasi-fiduciary role as an employee representative in certain contractual grievance proceedings. *See id.* at 14–15, App. 186–187. Upholding the ALJ's decision on the main ground, the Board explicitly declined to rest its decision on this basis, Decision of the Board, *supra* note 10, at 1–2, App. 198–199.

13. *See* ALJ Opinion, *supra* note 10.

14. The ALJ distinguished the case of *Pacific Southwest Airlines, Inc.*, 242 NLRB No. 151, 101 LRRM 1366 (1979), on the ground that the Board, in deferring to an arbitrator's ruling, expressly declined to express its view on the merits. *See* ALJ Opinion, *supra* note 10, at 12–14, App. 184–186.

15. *Id.* at 7, App. 179 (footnote omitted).

16. Decision of the Board, *supra* note 10, at 1, App. 198.

prior to disciplinary action, we have struck the balance in favor of the interests of the employer. Our decision today does not alter that balance.

In the instant case, however, [the employer] had already completed an investigatory process pursuant to which it was determined that discipline of an employee was justified. Disciplinary action was taken, the grievance machinery was activated, and the dispute was to be submitted to arbitration. At this juncture, when an employer seeks to question its employees, it moves into the arena of seeking to vindicate its disciplinary decision and of discovering the union's arbitration position, and moves away from the legitimate concern of maintaining an orderly business operation. In this context, for the reasons stated by the Administrative Law Judge, we find that the delicate balance must be struck in favor of the employees, and that an employer that seeks to compel its employees to submit to questioning in such circumstances violates Section 8(a)(1).[17]

Following the Board's decision the employer petitioned for review in this court. The Board filed a cross-application for enforcement of its order.

## II

Because the Board justified its resolution of the present case by invoking a general rule of decision, the validity of that rule is squarely and indisputably before this court. We could not affirm the Board's decision

except on the reasoning advanced by it to support its conclusions.[18]

Unlike the majority, however, I believe that the underlying facts are important both to understanding the decision of the Board and to appraising its legality. In articulating an interpretive rule for application of Section 8(a)(1) in the arbitration context, the Board was entitled to rely at least partly on its general expertise concerning the purposes and illegitimate coercive effects of compulsory interviews of employees after grievances have been set for arbitration.[19] But the facts of the present case also provide substantial evidence for the Board's conclusion that, after an employer has imposed disciplinary sanctions and a dispute has been submitted to arbitration, an employer who threatens his employees with suspension or dismissal for noncooperation in a discovery interview "moves into the arena of seeking to vindicate its disciplinary decision and of discovering the union's arbitration position, and moves away from the legitimate concern of maintaining an orderly business operation." [20]

Because of their importance to the case, certain operative facts deserve close scrutiny.

### A.

The dispute involved in the present case grew out of a decision by the Cook Paint & Varnish Company to fire an employee named Paul Thompson.[21] The firing oc-

---

17. *Id.* at 2–3, App. 199–200 (footnotes omitted).

18. As the Supreme Court held in *SEC v. Chenery Corp.,* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943), "The ground upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Chenery* recognized an apparent exception for cases in which the decision could be affirmed on purely legal grounds, not requiring judgments of fact or policy. *Id.* at 88, 63 S.Ct. at 459. Here, however, any decision whether Cook committed an "unfair labor practice" depends on a balancing of statutory interests entrusted by Congress to the Board, not to this court.

19. *E. g., NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (general experience of Board appropriately invoked by it in construing statutory term to apply to broad classes of employees without *ad hoc* decisions in individual cases); *United Steelworkers of America v. NLRB,* 646 F.2d 616, at 636 (D.C.Cir. 1981) (Board entitled to rely on special expertise in identifying coercive practices and their effects).

20. Decision of the Board, *supra* note 10, at 2–3, App. 199–200 (footnote omitted).

21. The facts are set out in detail in ALJ Opinion, *supra* note 10, at 2–5, App. 174–177.

curred on February 6, 1978, triggered by events that had occurred three days earlier. It is undisputed that Thompson had left work early on February 3, 1978, allegedly to see a doctor. The record reflects a dispute between company and union whether Thompson did or did not carry out his assignments on that date, and whether in performing his assignments he slipped and fell.[22]

On February 6 Thompson was summoned to the office of the company's labor relations manager.[23] The meeting began with an announcement that Thompson was to be discharged that day for insubordination and insufficient production. It continued thereafter for approximately three hours, as company and union representatives discussed the events surrounding Thompson's departure from work on February 3. Among those present was union steward Jesse Whitwell, who participated freely in the discussion and answered company questions about the incident.[24] The company apparently made no effort at that time to secure information from Doug Rittermeyer, the employee who had cleaned up the spilled material left by Thompson upon his departure on February 3.

Immediately following Thompson's discharge the union filed a grievance on his behalf. Apparently satisfied with the fact-finding that had preceded Thompson's firing, the company made no effort to obtain evidence from other employees prior to the initial hearing provided by the collective bargaining agreement. It clearly could have done so under a string of NLRB decisions, the validity of which the Board affirmed in the present case.[25] Only when the initial procedure failed to resolve the dispute, and the union invoked arbitration, did the company's outside labor attorney, William Nulton, summon union steward Whitwell to a discovery interview.[26] It was at this point—more than two months after the company had completed its initial investigation of the incident, more than two months after it had fired Thompson, and after it had brought in an outside lawyer to represent its adversary position in binding arbitration—that Whitwell attempted to assert a Section 7 right not to be interviewed. Company spokesmen thereupon threatened him with suspension if he failed, not only to answer questions, but also to disclose the contents of his union notebook.[27] Rittermeyer was similarly threatened that he must answer questions or face suspension.[28]

### B.

The majority holds that management coercion of employee testimony in a pre-arbitral context is not necessarily violative of employee rights protected by Section 7. So long as the company has a legitimate interest in the information it seeks, the majority would tolerate threats of suspension or other coercive techniques. Its implicit assumption seems to be that attempts to coerce employees in ways violative of legitimate Section 7 interests are rare or that the Section 7 interests of employees are relatively narrow or insignificant.

In holding as it does the majority not only overrides the considered judgment of the Board; it ignores a line of cases recognizing that the employees' Section 7 right to engage in concerted action for mutual aid and protection encompasses an interest in maintaining silence in the face of questioning by an adversary employer.[29] The

22. *Id.* at 2, App. 174.

23. *Id.* at 3, App. 175.

24. *Id.*

25. Decision of the Board, *supra* note 10, at 2, App. 199.

26. ALJ Opinion, *supra* note 10, at 4, App. 176.

27. *Id.*

28. *Id.* at 5, App. 177.

29. Both the courts, *see, e. g., International Union, United Automobile, etc. Wkrs of America v. NLRB, supra* note 4, 392 F.2d at 809; *Joy Silk Mills, Inc. v. NLRB, supra* note 4, 185 F.2d at 734–744, and the NLRB, *see, e. g., Johnnie's Poultry Co., supra* note 4, 146 NLRB at 775, have held explicitly that employer interrogation of an employee during the pendency of a case before the NLRB is inherently coercive of employee rights protected by § 7. A similar rec-

leading cases prohibiting coerced discovery of employee testimony have involved unfair labor practice proceedings before the NLRB itself. *See, e. g., International Union, United Automobile, etc. Wkrs of America v. NLRB,* 392 F.2d 801 (D.C.Cir.1967), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968); *Joy Silk Mills, Inc. v. NLRB,* 185 F.2d 732, 743–744 (D.C.Cir. 1950). In this context the law is clear: Once a grievance is scheduled for hearing before the NLRB, the employer may not force an employee to give discovery testimony adverse to his own interests, those of a fellow employee, or those of his union, nor may an employee be subjected to interrogation that he might construe as threatening or coercive of his possible testimony before the Board itself. The rationale for these cases follows from the clear language and policy of the statute, which aims to protect the interest of workers in engaging in joint action for their mutual protection after lines are drawn and labor and management are locked into adverse roles. As this court held in the *International Union* case, *supra,* "employer interrogation of employees *during a labor dispute*" possesses an "inherently coercive nature * * * in violation of an employee's Section 7 rights * * *." 392 F.2d at 809 (emphasis added).[30]

Ignoring cases holding that Section 7 prohibits coercive interviews once a dispute has been scheduled for hearing before the NLRB, the majority finds its main support for the legitimacy of coercive interrogation in decisions arising from one very different context: cases upholding the legitimacy of coercive interviews during predisciplinary investigations of employee misconduct.[31] Yet, as the Board recognized, it is crucial that these cases involved questioning conducted *prior* to an employer's determination that discipline was required. Like those cases forbidding discovery in cases before the Board, these cases called for a balancing of employer against employee interests.[32] And, in prediscipline cases, the employer's interest in attaining information essential to the orderly conduct of his business—without resort to the NLRB or other authority to obtain a discovery order—has been held to predominate over the employees' statutory interest in providing mutual support and protection. However, as is demonstrated by the cases involving proceedings before the NLRB, the statutory balance will at some point tip the other way, as the parties become entrenched adversaries in a labor dispute. In this context the employer's interest in the orderly conduct of business gives way to an adversarial interest in prevailing in the forthcoming adjudication. Because the employer's adversarial interest may embrace such illegiti-

ognition that § 7 provides employees at least a *prima facie* right to resist discovery interviews in the arbitration context seems implicit in the NLRB's balancing of employer interests against employee rights in *Service Technology Corp., supra* note 4, 196 NLRB at 847, and *Primadonna Hotel Inc., supra* note 4, 165 NLRB 111.

**30.** The majority disparages the significance of these cases by distinguishing between protection of rights arising under law and rights arising under contract:

There is a critical difference, however, between cases set before the NLRB and cases set for arbitration. Proceedings before the NLRB are instituted to protect employee rights arising under the National Labor Relations Act. Proceedings before an arbitrator are instituted to resolve contractual disputes arising under a collective bargaining agreement. * * *

Majority opinion (Maj. op.), 648 F.2d at 730 n.25. This attempted distinction would seem to suggest that the § 8(a)(1) prohibition of "unfair labor practices" has no application in the arbitration context. The case law, however, makes it abundantly clear that the NLRA bars certain coercive actions by employers as inherently unfair and unlawful, without reference to the terms of individual contracts. *See, e. g., Keokuk Gas Service Co. v. NLRB, supra* note 3, 580 F.2d at 333–334; *Daphne San Francisco Funeral Service, supra* note 3, 224 NLRB 461; *El Dorado Club,* 220 NLRB 886, 889 (1975).

**31.** Although the majority points to a number of cases holding that employers and employees are obliged to exchange information prior to arbitration, it cites only two, *Service Technology Corp., supra* note 4, and *Primadonna Hotel Inc., supra* note 4, in which it has been approved by a court of law.

**32.** This was explicitly recognized by the Board in both *Service Technology Corp., supra* note 4, and *Primadonna Hotel Inc., supra* note 4.

mate aims as intimidation of a potential witness, discovery of litigating strategy or bargaining positions, and coercion of other protected information, this court has followed the NLRB in establishing stringent safeguards concerning the conduct of discovery interviews in unfair labor practice cases pending before the Board. In *International Union, supra,* for example, this court embraced the prophylactic standards enunciated by the NLRB, under which " 'the employer must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis; the questioning * * * must not be itself coercive in nature.' " [33] Employer questioning not in accordance with this standard has generally been held by the courts to constitute a violation of the unfair labor practices prohibition of Section 8(a)(1).[34] And no court has yet upheld the legality of coercive interviews in this advanced adversarial context.[35]

In the present litigation this court is called upon to review the NLRB's balancing of employer and employee interests in the context of compulsory arbitration proceedings—the most advanced form of dispute resolution provided by the collective bargaining agreement. Although the majority holds otherwise, I believe that the balancing

question here is closely analogous to that presented in "unfair labor practice" cases before the Board—more analogous, surely, than it is to the question involved in cases of employer investigations to determine whether to discipline an employee.

The Board held in this case that once a grievance has reached the stage of arbitration, an employer seeking to compel testimony from its employees "moves into the arena of seeking to vindicate its disciplinary decision and of discovering the union's arbitration position, and moves away from the legitimate concern of maintaining an orderly business operation." [36] The facts illustrate the total reasonableness of this conclusion. The company here sought to interview a union steward. It attempted to coerce production of a union notebook.[37] And, even regarding his questioning of the employee who was not a union officer, the company lawyer in the present case stated plainly that one of his aims in seeking the interviews was to discover "what the union's position would be if it went to arbitration." [38] Based on these situational facts, I would regard this case as falling within the persuasive rationale of the cases prohibiting coerced discovery of employee testimony in cases pending before the NLRB.[39]

---

**33.** *International Union, United Automobile, etc. Wkrs of America v. NLRB, supra* note 4, 392 F.2d at 809, *quoting Johnnie's Poultry Co., supra* note 4, 146 NLRB at 775.

**34.** *See, e. g., International Union, United Automobile, etc. Wkrs of America v. NLRB, supra* note 4; *NLRB v. Neuhoff Bros., Packers, Inc.,* 375 F.2d 372, 378 (5th Cir. 1967); *and Montgomery Ward & Co. v. NLRB,* 377 F.2d 452, 456 (6th Cir. 1967), all applying the *Johnnie's Poultry* standard quoted at text accompanying note 33 *supra.*

**35.** Indeed, in circuits that have adopted a "totality of circumstances" test to identify unfair labor practices in this context, the relevant question has typically been framed as whether "coercion" occurred. *See, e. g., A & R Transport, Inc. v. NLRB,* 601 F.2d 311, 317 (7th Cir. 1979); *Retired Persons Pharmacy v. NLRB,* 519 F.2d 486, 492 (2d Cir. 1975).

**36.** Decision of the Board, *supra* note 10, at 2–3, App. 199–200 (footnote omitted).

**37.** ALJ Opinion, *supra* note 10, at 4, App. 176.

**38.** Decision of the Board, *supra* note 10, at 3 n.3, App. 200 n.3.

**39.** Indeed, given the acceptance by the Board and by the courts of the so-called *Spielberg* doctrine, *see* note 53 and accompanying text *infra,* the danger and injustice of permitting employer coercion of employee testimony may be even greater in the context of an arbitration than in disputes before the Board itself. Under *Spielberg* the Board will sometimes defer to an arbitrator's decision, even though it might have decided an issue differently had it reached the merits. The benefits of the Board's special expertise in detecting the wrongful effects of coercive practices, *see United Steelworkers of America v. NLRB, supra* note 19, 646 F.2d at 626, are thus more likely to be lost in an arbitration case than they are in a controversy before the Board for decision on the merits.

## C.

The majority concludes otherwise. In its view, the lawyer Nulton's declaration of purpose—to discover what the union's position would be if it went to arbitration—requires heavy discounting. The "most important[ ]" reason for finding no violation of Section 8(a)(1), it asserts, is that "there is no substantial evidence to support a finding that Nulton" did in fact "use the interviews to discover the union's position at the upcoming arbitration." [40] Assuming *arguendo* the absence of "substantial evidence" showing that Nulton did discover the union's bargaining position or litigating strategy in this particular case, I would still uphold the Board's conclusion that employer coercion of employee testimony in the pre-arbitral context—"once arbitration is invoked [and] the fact is in the fire and the parties are unquestionably 'adversaries' " [41]—is violative of employee interests protected by Section 7. First, unlike the majority I would take cognizance of the Board's special expertise in identifying the regular and predictable—if not necessarily invariant—effects of certain employer practices. Apparently unlike the majority, I take seriously what this court said recently in *United Steelworkers of America v. NLRB*, 646 F.2d 616, at —— (D.C.Cir. 1981):

> Coercive effects are difficult to prove, yet at the same time the most important to dissipate. Certainly in this setting even more so than in other areas, the Board possesses an unmatched expertise * * *. We believe that the Board may rely on that expertise, and on the cumulative experience of past cases, to *presume* that certain employer conduct will inevitably produce certain effects on employees.

(Emphasis added.)

Against this realist view of the difficulty of demonstrating coercive effects in a particular case, the current majority would seemingly insist that every case should be decided on a balancing of its unique facts. In an ideal world, I would agree. In labor disputes in the real world, however, an employee whose rights must be culled from a complex body of uncertain facts and arcane decision law may have no rights that he can enforce effectively, the NLRA's Section 7 notwithstanding. Indeed, the facts of this case amply illustrate the impossibility of the employee's problem under such circumstances. Jesse Whitwell, the union steward whose testimony and notebook were sought by the employer, was summoned to the office of the company president and threatened with suspension if he did not cooperate.[42] The lawyer Nulton there advised him of the legality of the threatened sanction.[43] Although Whitwell was permitted to consult a union attorney, that lawyer had *no opportunity to conduct legal research* before giving his apparently tentative opinion that Whitwell could not be punished for refusing to submit to discovery. Under the circumstances, it is not surprising that Whitwell dared not refuse to answer questions and presumably would not have dared to refuse, no matter how legally intolerable the scope of the employer's inquiry. As the situation was aptly summarized for him by the company lawyer, "You have the opinion of two attorneys here *but it is your job that is on the line.*" [44]

Against a realist backdrop, a principal virtue of the Board's enunciated rule would lie in its simplicity and enforceability. This court should *not strip the NLRB of power* to propound enforceable standards.

## III

As I read its opinion, the majority rests its decision on two principal bases. Both assume an unnecessarily broad and therefore unwarranted reading of the Board's decision. Because no such reading is necessary to support the decision under review, this case presents no necessary or proper

---

**40.** Maj. op., 648 F.2d at 723–724 n.24.

**41.** ALJ Opinion, *supra* note 10, at 11, App. 183.

**42.** *Id.* at 4, App. 176.

**43.** *Id.*

**44.** *Id.* (emphasis added).

occasion to invalidate a rule that could reasonably be construed in a manner obviating the majority's asserted objections.

As construed by the majority, the Board's order establishes a *per se* rule that an employer can never have a *right* to discover facts from an employee after a labor dispute has reached the stage of arbitration.[45] The majority finds this rule impermissible for two reasons. First, it argues that arbitration rights and procedures are appropriately governed by contract. It therefore holds that the Board acted impermissibly in establishing a standard that would limit the right of parties to bargain for alternative dispute settlement procedures.[46] Second, the majority argues that the Board's decision destroys the statute's intended parity of labor and management obligations to supply information.[47]

As I read the Board's opinion, however, it need not be construed as holding that an employer may never have a right to obtain evidence from its employees in pre-arbitral interviews; it definitively establishes only that unilateral coercion and intimidation are not legitimate mechanisms for enforcing such a right in the advanced adversarial posture of an arbitration proceeding.[48] Although it may be possible to understand the Board as having said more, it is unnecessary and therefore inappropriate for this court to do so at this time. I would assume only what is essential to the Board's decision of this case: that it forbids employers to obtain evidence by threats of dismissal or other unilaterally coercive and intimidating measures after a dispute has gone to arbitration. Similarly, although the majority is again eager to read the Board's opinion as broadly as possible and thus to resolve issues that might or might not arise in future cases, I see nothing in the Board's opinion upsetting any statutory parity of labor and management rights to information, or the parity of their rights to bargain for access to information either during arbitration or during any other grievance proceeding. Although the Board holds management coercion to be an unfair tactic in pre-arbitral interviews, it leaves open all other avenues by which an employer might obtain testimony from an employee after a dispute has gone to arbitration. For example, an employer might rely on the compulsory process of tribunals created either by contract between the parties or by statute—just as a union must do if it wishes to obtain information from an unwilling employer.

Certain portions of the majority opinion suggest that coercion is itself a proper and accepted mechanism of information procurement, which should be upheld on policy grounds as conducive, at least indirectly, to the settlement of labor grievances.[49] Such judgments of disputed fact and policy are more properly made by the NLRB than by this court, especially when statutory interests in information procurement threaten to conflict with employee interests protected

---

**45.** *See* Maj. op., 648 F.2d at 721–722.

**46.** *Id.,* 648 F.2d at 721–722.

**47.** *Id.,* 648 F.2d at 716–717.

**48.** The relevant portion is printed in text preceding note 17 *supra.*

At least in certain portions of its opinion the majority refuses to acknowledge any distinction between unilaterally coercive and non-coercive procurement of information. *See especially* Maj. op., 648 F.2d at 725 & n.25. Although the majority suggests otherwise, I believe that the difference between my analysis and that of the majority stems more from disagreement about the significance of coercion than from disagreement about the relevance of contract. I do not disagree with the majority view that "pre-arbitration interviews are part of the [contractually created] grievance-arbitra-

tion process." *Id.* I do not, however, see how "it clearly follows," *id.* that pre-arbitral threats and similar coercion—any more than firings and beatings—are insulated from condemnation under the NLRA as "matter[s] to be decided by the parties." *Id.* To respect a contractual agreement to supply information is one thing; to uphold the legitimacy of unilateral coercion to enforce rights claimed under an agreement is quite another—especially where, as here, the rights claimed may themselves be matters of dispute. Here, it may be worth recalling, the company threatened Whitwell with coercive reprisal if he failed to turn over his union notebook.

**49.** *See* Maj. op. 648 F.2d at 720 (suggesting employer coercion needed to make rights "enforceable").

by Section 7. *See, e. g., NLRB v. Truck Drivers Local 449*, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957) ("The function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which Congress has committed primarily to the National Labor Relations Board, subject to limited judicial review.").

Moreover, from a legal perspective the chain of argument supporting the majority position is not strong. The majority cites cases supporting the proposition that provision of information is necessary if arbitration is to work effectively, relying especially on *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967), and *Fawcett Printing Corp.*, 201 NLRB 964 (1973). But the majority fails to establish a persuasive link between *Acme* and *Fawcett* and those cases in which the Board has recognized the legitimacy of employer efforts to coerce testimony—cases generally involving inquiries into employee misconduct *prior* to imposition of final disciplinary action. The link is highly questionable. Although the language of *Acme* suggests the desirability of an information exchange, it nowhere suggests that the best time for this exchange to occur is during the arbitral process. Thus the underlying policy aims of *Acme* would seem satisfied as long as there is an opportunity for the parties to procure proper information at some stage of the dispute resolution process. And certain language in the *Acme* opinion seems to suggest that national labor policy is best served when information is provided and disputes resolved, not after the invocation of arbitration, but at the *earliest point possible*:

> [I]f all claims originally initiated as grievances had to be processed through to arbitration, the system would be woefully overburdened. Yet, that is precisely what [the employer's asserted right never to provide information except in an actual arbitration hearing] would require. It would force the union to take a grievance

all the way through to arbitration without providing the opportunity to evaluate the merits of the claim. * * * [50]

The ALJ, whose conclusions the Board adopted, reasoned explicitly from this premise. Permitting coercive discovery at the arbitral stage, she stated, "would make a sham of the prearbitral grievance procedures carefully spelled out in most union contracts; if the parties know that they can lose nothing by postponing their investigations until the grievance step, * * * [t]he result will inevitably be delays, the avoidance of which is a major purpose of grievance and arbitration provisions." [51] The majority takes issue with this position at least partly on factual grounds, suggesting that grievances will be better resolved if employers are able to conduct coercive interviews at any stage of the dispute resolution process. For reasons that seem to me to be obvious, I cannot join this court in lecturing the NLRB about how the statutory policy of promoting settlements can best be effectuated.

The majority's second main argument against the Board's decision topples with the first. Far from destroying the parity between labor and management obligations to supply information, the Board's holding serves to place them in positions of practical as well as theoretical equality. Common sense suggests that an employee has no effective means of coercing an employer to comply with its discovery requests prior to an arbitration. It seems to be no accident that the company ignored union requests for information in the present case.[52] An employer, on the other hand, will, as a practical matter, frequently be able to use the threat of discipline or dismissal to extract information—including information to which it has no legal right—from an unwilling employee. In removing this unfair advantage held by the employer, the Board, in my judgment, acted entirely consistently with the statutory policy of mutuality of labor and management obligations to sup-

---

**50.** *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 438, 87 S.Ct. 565, 569, 17 L.Ed.2d 495 (1967).

**51.** ALJ Opinion, *supra* note 10, at 13, App. 185.

**52.** *See id.* at 9, App. 181.

ply information. The majority's second argument is therefore also mistaken.

The majority also advances, but relies less heavily upon, a third argument that the Board failed to reconcile its decision in this case with the result in *Pacific Southwest Airlines, Inc.*, 242 NLRB No. 151, 101 LLRM 1366 (1979). In that case the Board explicitly invoked the so-called *Spielberg* doctrine, *see Spielberg Manufacturing Co.*, 112 NLRB 1080 (1955), under which the Board defers to the decision of an arbitrator without endorsing his analysis. The majority rightly argues that deference, as acknowledged by the Board, is appropriate only if the arbitrator's decision is not clearly repugnant to the purposes and policies of the Act.[53] It then argues that, if upholding the coercive interview in *Spielberg* was not inconsistent with the Act, then the Board cannot now propound a decision rule holding that coercive interviews are violations of Section 8. The majority's argument may be rejected on either of two grounds. First, the Board gave a reasoned explanation of its *Pacific Southwest* decision and why it lacked binding force in the present controversy. Consistent with its analysis of the underlying factual situation as presenting a conflict of legitimate employee interests with legitimate employer interests, the Board stated that "an award vindicating either of the conflicting rights cannot be viewed as being clearly repugnant to the policies of the Act."[54] Second, the arbitrator in *Pacific Southwest* found only that the employer had not violated Section 7 in a particular case. But the decision of a particular case should not bar the Board from developing a rule permitting the presumption that a certain kind of employer conduct will have predictable and impermissible effects in *most* cases, particularly when "[c]oercive effects are difficult to prove, yet * * * important to dissipate," and "the

Board possesses an unmatched expertise"[55] in identifying the harmful conduct.

## IV

Properly construed, the Board's decision in this case, in my view, is supported by substantial evidence and otherwise free of legal error. Like the NLRB, I would therefore think it unnecessary to reach the question whether Jesse Whitwell, because of his position as a union steward, enjoyed special statutory rights that were violated by the coercive interview conducted in this case. Because the majority rejects the Board's stated rationale for finding an unfair labor practice, however, questions about the relevance of Whitwell's union office and functions become central to a fair adjudication of the union's claim under Section 8(a)(1). Under the circumstances, I agree that the Board must be given an opportunity to consider whether Whitwell was entitled to special protection because of his status as a union steward. Forced by the majority to reach this issue, I concur that the case should be remanded to the Board for further findings regarding the legality of a coercive interview of a union steward in the factual setting presented by this case. As to the main issue in the case, however, I respectfully dissent.

---

**53.** Maj. op., 648 F.2d at 729–730.

**54.** Decision of the Board, *supra* note 10, at 5, App. 202.

**55.** *United Steelworkers of America v. NLRB, supra* note 19, 646 F.2d at 626; *see Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 374, 93 S.Ct. 1652, 1663, 36 L.Ed.2d 318 (1973) ("[A] requirement that a line be drawn which insures that not one blameless individual will be subject to the provisions of an act would unreasonably encumber effective administration and permit many clear violators to escape * * * entirely.").